**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN STURGEON,
*Plaintiff-Appellant*,

STATE OF ALASKA,
*Plaintiff-Intervenor*,

v.

SUE MASICA, in her official capacity
as Alaska Regional Director of the
National Park Service; GREG
DUDGEON; ANDEE SEARS; SALLY
JEWELL, Secretary of the Interior;
JONATHAN JARVIS, in his official
capacity as Director of the National
Park Service; THE NATIONAL PARK
SERVICE; THE UNITED STATES
DEPARTMENT OF THE INTERIOR,
*Defendants-Appellees*.

No. 13-36165

D.C. No.
3:11-cv-00183-
HRH

STATE OF ALASKA,
*Intervenor-Plaintiff–Appellant*,

and

JOHN STURGEON,
*Plaintiff*,

v.

SUE MASICA, in her official capacity
as Alaska Regional Director of the
National Park Service; GREG
DUDGEON; ANDEE SEARS; SALLY
JEWELL, Secretary of the Interior;
JONATHAN JARVIS, in his official
capacity as Director of the National
Park Service; THE NATIONAL PARK
SERVICE; THE UNITED STATES
DEPARTMENT OF THE INTERIOR,
*Defendants-Appellees*.

No. 13-36166

D.C. No.
3:11-cv-00183-
HRH

OPINION

Appeal from the United States District Court
for the District of Alaska
H. Russel Holland, Senior District Judge, Presiding

Argued and Submitted
August 12, 2014—Anchorage, Alaska

Filed October 6, 2014

Before: Jerome Farris, Dorothy W. Nelson,
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Nguyen

## SUMMARY[*]

### Standing / National Park Service

The panel affirmed the district court's summary judgment in favor of federal appellees, and vacated the judgment against intervenor/appellant State of Alaska, due to its lack of standing, in an action brought by John Sturgeon challenging the National Park Service's enforcement of a regulation banning the operation of hovercrafts on the Nation River.

Tha National Park Service ("NPS") ban prevented Sturgeon from using his personal hovercraft on his moose hunting trips on the Nation River, part of which falls within the Yukon-Charley Rivers National Preserve. The State of Alaska intervened, challenging NPS's authority to require its researchers to obtain a permit before engaging in studies of chum and sockeye salmon on the Alagnak River, part of which falls within the boundaries of the Katmai National Park and Preserve.

The panel held that Sturgeon established Article III standing. The panel also held that the federal appellees waived their prudential standing arguments. The panel

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

further held that the State of Alaska lacked standing to challenge the NPS regulations. The panel vacated the district court's judgment as to Alaska, and remanded with instructions that Alaska's case be dismissed for lack of jurisdiction.

The panel rejected Sturgeon's contention that § 103(c) of the Alaska National Interest Lands Conservation Act precluded NPS from regulating activities on state-owned lands and navigable waters that fell within the boundaries of National Park System units in Alaska. The panel held that Sturgeon's interpretation of § 103(c) was foreclosed by the plain text of the statute. The panel held that even assuming that the waters of and lands beneath the Nation River had been "conveyed to the State" for purposes of the Alaska National Interest Lands Conservation Act § 103(c), NPS's hovercraft ban was not a regulation that applied solely to public lands within conservation system units in Alaska; and given its general applicability, the regulation could be enforced on both public and nonpublic lands alike within conservation system units.

The panel also rejected Sturgeon's arguments that the Secretary of the Interior exceeded her statutory authority in promulgating the regulation at issue, and that her action raised serious constitutional concerns.

**COUNSEL**

Matthew T. Findley (argued) and Eva R. Gardner, Ashburn & Mason, P.C., Anchorage, Alaska; Douglas Pope, Pope & Katcher, Anchorage, Alaska, for Plaintiff-Appellant John Sturgeon.

Jeanie Ann Nelson (argued), Assistant Attorney General, State of Alaska, Department of Law, Anchorage, Alaska, for Intervenor-Plaintiff-Appellant State of Alaska.

Elizabeth Ann Peterson (argued), Andrew C. Mergen, David C. Shilton, Dean K. Dunsmore, Vivian H. W. Wang, and Sam Hirsch, Acting Assistant Attorney General, United States Department of Justice, Environment and Natural Resources Division, Washington, D.C.; Jason Waanders, United States Department of the Interior, Office of the Solicitor, Philadelphia, Pennsylvania; F. Christopher Bockmon, United States Department of the Interior, Office of the Solicitor, Anchorage, Alaska, for Defendants-Appellees.

Jahna M. Lindemuth and Katherine Demarest, Dorsey & Whitney LLP, Anchorage, Alaska, for Amicus Curiae Cook Inlet Region, Inc., Arctic Slope Regional Corp., Koniag, Inc., Chickaloon Moose Creek Native Association, Inc., Knikatnu, Inc., Ninilchik Natives Association, Inc., Salamatof Native Association, Inc., Seldovia Native Association, Inc., and Tyonek Native Corp.

James D. Linxwiler and Josh Van Gorkom, Guess & Rudd P.C., Anchorage, Alaska, for Amicus Curiae native corporations.

Katherine Strong and Valerie Brown, Trustees for Alaska, Anchorage, Alaska; Thomas E. Meacham, Anchorage, Alaska, for Amicus Curiae National Parks Conservation Association.

---

**OPINION**

NGUYEN, Circuit Judge:

John Sturgeon ("Sturgeon") challenges the National Park Service's ("NPS") enforcement of a regulation banning the operation of hovercrafts on the Nation River, part of which falls within the Yukon-Charley Rivers National Preserve. The ban prevented Sturgeon from using his personal hovercraft on his moose hunting trips on the Nation River. The State of Alaska intervened, challenging NPS's authority to require its researchers to obtain a permit before engaging in studies of chum and sockeye salmon on the Alagnak River, part of which falls within the boundaries of the Katmai National Park and Preserve.

Sturgeon and Alaska present the same legal argument: § 103(c) of the Alaska National Interest Lands Conservation Act ("ANILCA") precludes NPS from regulating activities on state-owned lands and navigable waters that fall within the boundaries of National Park System units in Alaska. The district court granted summary judgment in favor of the federal appellees. Because we find that Sturgeon's interpretation of § 103(c) is foreclosed by the plain text of the statute, we affirm as to Sturgeon. We hold that Alaska lacks standing to bring this challenge, and thus vacate and remand with instructions that Alaska's case be dismissed.

## I.

The facts are straightforward and largely undisputed. Since 1971, Sturgeon has hunted moose on an annual basis on the Nation River.[1] The lower six miles of the Nation River lie within the Yukon-Charley Rivers National Preserve ("Yukon-Charley"), which is a unit of the National Park System. In 1990, Sturgeon purchased a small, personal hovercraft, which he used on his hunting excursions. In September 2007, while repairing his hovercraft on a gravel bar adjoining the river, Sturgeon was approached by three NPS law enforcement employees. They informed him that NPS regulations prohibited the operation of hovercrafts within the Yukon-Charley and issued him a verbal warning. Sturgeon protested that the NPS regulations were inapplicable because he was operating his hovercraft on a state-owned navigable river. Sturgeon contacted his attorney via satellite phone, who in turn contacted Andee Sears, a Regional Law Enforcement Specialist with NPS. Sears told Sturgeon's attorney that the hovercraft must be removed from the Yukon-Charley. Sturgeon complied.

Later, Sturgeon followed up with Sears over the phone and met with him in Anchorage. Sears advised Sturgeon that even though Alaska might own the submerged land beneath the river, the hovercraft ban was nonetheless in force within

---

[1] The Nation River is a tributary of the Yukon River. While Sturgeon's complaint also mentions his hunting excursions on the Yukon River, part of which also falls within the Yukon-Charley Rivers National Preserve, he failed to raise a separate claim for the Yukon River. Thus, the district court found that only the applicability of the regulation to the Nation River was before the court. *Sturgeon v. Masica*, No. 3:11-CV-0183-HRH, 2013 WL 5888230, at *6 (D. Alaska Oct. 30, 2013). Sturgeon does not challenge that finding on appeal.

the boundaries of the Yukon-Charley. Sears warned Sturgeon that he risked criminal liability if he operated his hovercraft within the Yukon-Charley. In response to these warnings, Sturgeon refrained from using his hovercraft during the 2008 to 2010 moose hunting seasons and has not been able to hunt on the portions of the Nation River that fall within the boundaries of the Yukon-Charley.

Although Sturgeon sent a letter to then-Secretary of the Interior, Ken Salazar, petitioning for repeal or amendment of the NPS regulations restricting his access to navigable waters located within national park boundaries, he did not receive a response. He then sued in federal district court, seeking an order declaring that NPS's regulations violated ANILCA, as applied to him on state-owned lands and waters, and enjoining the federal defendants from enforcing these regulations.

Alaska intervened, raising the same argument that the application and enforcement of NPS regulations on state-owned lands and waters violated ANILCA. Specifically, Alaska challenged NPS regulations that required employees of the Alaska Department of Fish and Game to obtain a scientific research and collecting permit before engaging in genetic sampling of chum and sockeye salmon on the Alagnak River. These regulations purportedly harmed Alaska "in the form of increased staff time and expense in complying with NPS procedures and in the form of delays in implementing the project." Alaska further argued that NPS's actions both interfered with its sovereign right to manage and regulate its lands and waters and chilled its citizens' ability to enjoy the rights and benefits flowing from its management of state resources.

On summary judgment, the district court ruled in favor of the federal appellees. *Sturgeon v. Masica*, No. 3:11-CV-0183-HRH, 2013 WL 5888230, at \*9 (D. Alaska Oct. 30, 2013). The district court found that Sturgeon's and Alaska's interpretation of ANILCA § 103(c) lacks support in the plain language of the statute. *Id.* at \*8–\*9. This appeal followed.

## II.

We review questions of law resolved on summary judgment de novo, and the district court's factual findings for clear error. *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 976 (9th Cir. 2012).

## III.

As an initial matter, the federal appellees contend that we lack jurisdiction over this appeal because Sturgeon and Alaska have failed to establish standing. Even though the federal appellees did not present these arguments to the district court below, they may nonetheless do so for the first time on appeal. The constitutional requirements for standing under Article III are jurisdictional, cannot be waived by any party, and may be considered sua sponte. *City of Los Angeles v. Cnty. of Kern*, 581 F.3d 841, 845 (9th Cir. 2009). The oft-repeated "irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "First, the plaintiff must have suffered an 'injury in fact,'" which is both concrete and particularized, as well as actual or imminent. *Id.* "Second, there must be a causal connection between the injury and the conduct complained of," meaning that the injury must be "fairly traceable to the challenged action of the defendant."

*Id*. (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976) (quotation mark and alterations omitted)).  Third, it must be likely that a favorable decision would redress the injury identified.  *Id.* at 561.

Apart from these constitutional concerns, "there exists a body of 'judicially self-imposed limits on the exercise of federal jurisdiction'" that forms the prudential standing doctrine.  *Cnty. of Kern*, 581 F.3d at 845 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)); *see also Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 289–90 (2008). Because these considerations are nonconstitutional in nature, they may be deemed waived if not previously raised before the district court.  *Cnty. of Kern*, 581 F.3d at 845.

## A.

We find that Sturgeon has established standing.  The federal appellees argue that Sturgeon has failed to show probable or imminent enforcement of the NPS regulations to meet the first requirement of an injury-in-fact.  The federal appellees' view, however, cannot be reconciled with the Supreme Court's recent decision in *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334 (2014), where the Court emphasized that *threatened* enforcement actions may suffice to create Article III injuries.  "When an individual is subject to such a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law."  *Id.* at 2342.  Thus, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'"  *Id.*

(quoting *Babbitt v. Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

Sturgeon has satisfied the injury-in-fact requirement. He has alleged an intention to use his hovercraft, and has contacted both NPS and the Department of the Interior regarding the applicability and enforcement of the regulation to his hovercraft use. Sturgeon's inability to use his hovercraft for moose-hunting purposes arguably implicates his right under the Privileges or Immunities Clause of the Fourteenth Amendment "to use the navigable waters of the United States, however they may penetrate the territory of the several States." *The Slaughter-House Cases*, 83 U.S. 36, 79 (1872); *see also Courtney v. Goltz*, 736 F.3d 1152, 1160 (9th Cir. 2013) (interpreting the Privileges or Immunities Clause to encompass "a right to *navigate* the navigable waters of the United States"). Sturgeon thus alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest." *Susan B. Anthony List*, 134 S. Ct. at 2342 (quoting *Babbitt*, 442 U.S. at 298).

Further, there is no dispute that his intended conduct is proscribed by NPS regulation. *See* 36 C.F.R. § 2.17(e) (stating that "[t]he operation or use of hovercraft is prohibited" within NPS-administered lands and waters, which include the Yukon-Charley). Finally, "there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 134 S. Ct. at 2342 (quoting *Babbitt*, 442 U.S. at 298). The federal appellees concede that Sturgeon received a verbal warning not to use the hovercraft, that Special Agent Sears told Sturgeon's lawyer that Sturgeon "should remove the hovercraft from the preserve," and that Sears later indicated that Sturgeon "[might] be subject to criminal liability if he

operated a hovercraft in the preserve."[2]   These facts are sufficient to show a credible threat of enforcement against Sturgeon.

Next, the federal appellees argue that any injury-in-fact identified by Sturgeon is not "fairly traceable" to actions of NPS.  We disagree.  The regulation was promulgated by NPS and enforcement has been threatened by NPS employees. Therefore, Sturgeon's injuries are "fairly traceable" to actions of NPS.   Finally, a favorable decision would redress Sturgeon's identified injury-in-fact, and the federal appellees do not contend otherwise.

In addition to contending that Sturgeon lacks Article III standing, the federal appellees argue that prudential considerations of ripeness and adverseness militate against a finding of standing.  However, the federal appellees failed to raise these arguments before the district court.  We thus find them waived, as prudential standing arguments "can be deemed waived if not raised in the district court" due to their nonconstitutional nature.[3]   *Cnty. of Kern*, 581 F.3d at 845 (quoting *Bd. of Natural Res. v. Brown*, 992 F.2d 937, 946 (9th Cir. 1993)) (internal quotation marks omitted).

---

[2] Indeed, if Sturgeon violated NPS's hovercraft ban, he would risk incurring a fine and imprisonment for up to six months. *See* 36 C.F.R. § 1.3(a).

[3] Moreover, it may be that the "Article III standing and ripeness issues in this case 'boil down to the same question'"–namely, whether a sufficient injury-in-fact exists to render the case ripe. *Susan B. Anthony List*, 134 S. Ct. at 2341 n.5 (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007)).

**B.**

The State of Alaska, on the other hand, lacks standing. Alaska offers three bases to support its standing: (1) harm "in the form of increased staff time and expense" in obtaining and complying with the terms of a scientific research and collecting permit; (2) injuries to Alaska's sovereign right to control its lands and waters; and (3) the Secretary of the Interior's denial of its petition for administrative proceedings that would repeal or amend the regulations at issue. We address each of the proffered bases in turn.

With regard to Alaska's chum and sockeye salmon study, the increased burdens to Alaska as a result of NPS's permit requirement clearly constitute injuries-in-fact. It is undisputed that NPS employees informed Alaska's Department of Fish and Game ("DFG") that a scientific research and collecting permit was required before it engaged in the study. The scientific research and collecting permit that DFG actually obtained and the General Conditions and Park Specific Guidance that accompanied it–all of which are part of the record–demonstrate that DFG was forced to comply with numerous obligations and limitations under the terms of the permit. To name just a few, DFG was not allowed to destroy research specimens without NPS's prior authorization, was obligated to catalogue collected specimens into NPS's Interior Collections Management System and label such specimens with NPS accession and catalog numbers, and was required to submit an Investigator's Annual Report and copies of other final reports and publications resulting from the study within a year of publication. The record thus amply supports Alaska's allegation of harm in the form of increased staff time and expense.

But while Alaska may have suffered cognizable injuries, a favorable ruling would not redress these injuries. Alaska's complaint sought a declaration that the NPS regulations were invalid and void as applied to state-owned lands and waters and an injunction barring future enforcement of the regulations on state-owned lands and waters. Such relief would not remedy injuries relating to DFG's chum and sockeye salmon study in 2010, which have already been incurred and suffered. At oral argument, Alaska represented that DFG's chum and sockeye salmon study is complete, and the record offers no indication that related studies or efforts are pending or forthcoming. In the absence of evidence showing how the requested relief would redress its identified injuries, Alaska may not rely on activities relating to the 2010 study of chum and sockeye salmon to establish standing. *Cf. Lujan*, 504 U.S. at 564 ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." (alteration in original) (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)) (internal quotation marks omitted).

The second basis proffered by Alaska presents a closer question. Alaska argues that the NPS regulations violate its "sovereign[]" and "proprietary interests" in its lands and waters, and interfere with its "authority and ability to manage its property in accordance with the Alaska Constitution and state law." States certainly possess sovereign and proprietary interests that may be pursued via litigation. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601–02 (1982); *see also, Pennsylvania v. New Jersey*, 426 U.S. 660, 665 (1976) ("It has . . . become settled doctrine that a State has standing to sue only when its sovereign or quasi-sovereign interests are implicated . . . ."). However, we

conclude that Alaska's arguments are unavailing for purposes of establishing standing under the circumstances of this case.

To begin with, Alaska failed to meet the requirement that its purported injuries be "actual or imminent." *Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)) (internal quotation mark omitted). Because Alaska did not identify any actual conflict between NPS's regulations and its own statutes and regulations, we are left with only a vague idea of how exactly NPS's permitting requirement infringes on the state's sovereign and proprietary interests in its lands and waters, or how the requirement interferes with the state's control over and management of those lands and waters. In the absence of such a conflict, Alaska's purported injuries are too "conjectural or hypothetical" to constitute injuries-in-fact. *Id.* (quoting *Whitmore*, 495 U.S. at 155) (internal quotation marks omitted).

Alaska has cited no case that finds standing based simply on purported violations of a state's sovereign rights. Rather, evidence of actual injury is still required. For example, in *Massachusetts v. EPA*, 549 U.S. 497 (2007), the Supreme Court found that Massachusetts had standing to challenge the EPA's denial of a rulemaking petition requesting regulation of greenhouse gas emissions under the Clean Air Act. *Id.* at 510–11, 526. The Court noted that the state was due "special solicitude in [the] standing analysis" based on two factors: (1) Massachusetts sought to vindicate a procedural right, which eliminated the need under Article III to demonstrate redressability and immediacy, and (2) Massachusetts's status as a "sovereign State." *Id.* at 517–20; *see also Washington Envtl. Council v. Bellon*, 732 F.3d 1131, 1144–45 (9th Cir. 2013) (distinguishing *Massachusetts v. EPA*). Even in light

of this special solicitude, however, the Court specifically found that "[b]ecause the Commonwealth 'own[ed] a substantial portion of the state's coastal property,' it ha[d] alleged a particularized injury in its capacity as a landowner" due to rising global sea levels. *Massachusetts*, 549 U.S. at 522 (citation omitted).

Similarly, in *Oregon v. Legal Services Corp.*, 552 F.3d 965 (9th Cir. 2009), Oregon contended that a private, nonprofit corporation established by the United States to provide federal funds to local legal assistance programs "thwart[ed] [its] efforts at policy making with regards to Oregon's Legal Service Program." *Id.* at 973. We rejected Oregon's claim because "there [was] no dispute over Oregon's ability to regulate its legal services program, and no claim that Oregon's laws ha[d] been invalidated as a result of the [corporation's] restrictions." *Id.* Because Oregon was able "to regulate its legal service programs as it desire[d]," there was thus "no judicially cognizable injury." *Id.* at 974.

Finally, *Nevada v. Burford*, 918 F.2d 854 (9th Cir. 1990), is also illustrative. Nevada challenged the Bureau of Land Management's decision to grant a right-of-way over state-owned land to the Department of Energy. *Id.* at 855. Because Nevada's complaint was "silent as to how [the Bureau's] alleged violations . . . resulted in injury to Nevada," in the absence of demonstrated injury, its claim "'constitute[d] a generalized grievance that the [Bureau] [was] not acting in . . . accordance' with federal laws" and was thus "insufficient to demonstrate standing." *Id.* at 856–57 (first, third, and fourth alterations added, second alteration in original) (quoting *Nevada v. Burford*, 708 F. Supp. 289, 295 (D. Nev. 1989)). *See also Table Bluff Reservation (Wiyot Tribe) v. Philip Morris, Inc.*, 256 F.3d

879, 883 (9th Cir. 2001) (finding no injury-in-fact where twenty Native American tribes challenged a Master Settlement Agreement between Philip Morris, Inc. and forty-six states, five territories, and the District of Columbia because the tribes identified no tribal regulations or contracts that would be affected by the Agreement).

Similarly, here, Alaska's claims regarding its sovereign and proprietary interests lack grounding in a demonstrated injury. While Alaska alleges that NPS regulations "have directly interfered with Alaska's ability as a sovereign to manage and regulate its land and waters," Alaska identifies no conflict between NPS regulations and its own state statutes and regulations.[4]  Any injury to Alaska's sovereign and proprietary interest is pure conjecture and thus insufficient to establish standing.

The third and final basis upon which Alaska relies to establish standing is the Secretary of the Interior's denial of its petition for new administrative proceedings. A plaintiff possesses standing to enforce procedural rights "so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Lujan*, 504 U.S. at 573 n.8. As discussed above, Alaska fails to identify any "threatened concrete

---

[4] Alaska also alleges that the NPS regulations have had "a chilling effect" on Alaskans' use and enjoyment of state-owned lands and waters. But "a state does not have standing 'to protect her citizens from the operation of federal statutes.'" *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 971 (9th Cir. 2009) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007)). And "the State must articulate an interest apart from the interests of particular private parties." *Id.* (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982)) (internal quotation mark omitted). Alaska has failed to do so.

interest." Alaska cannot rely on the Secretary's denial of its petition because "[p]articipation in agency proceedings is alone insufficient to satisfy judicial standing requirements." *Gettman v. Drug Enforcement Admin.*, 290 F.3d 430, 433 (D.C. Cir. 2002) (quoting *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 27 (D.C. Cir. 2002)) (internal quotation marks omitted). Alaska's "right to petition the agency does not in turn 'automatic[ally]' confer Article III standing when that right is deprived." *Id.* (alteration in original) (quoting Pet'rs' Br.).

Therefore, we hold that Alaska has failed to establish standing to challenge the NPS regulations. We vacate the district court's judgment as to Alaska and remand with instructions that Alaska's case be dismissed for lack of jurisdiction.

## IV.

We now turn to the merits of Sturgeon's challenge. Sturgeon contends that § 103(c) of ANILCA bars the application and enforcement of NPS's hovercraft ban on the Nation River,[5] which he contends is state-owned land. According to Sturgeon, the plain text of the statute, its legislative history, and our decision in *City of Angoon v. Marsh*, 749 F.2d 1413 (9th Cir. 1984), support his view.

---

[5] Many of Sturgeon's arguments resemble a facial challenge to NPS's general regulatory authority over nonfederal land within conservation system units. However, the district court's finding that Sturgeon had pleaded an as-applied challenge, *Sturgeon*, 2013 WL 5888230, at *1, is not contested on appeal, and we therefore limit our consideration to the regulation as applied to Sturgeon.

Before explaining why we find Sturgeon's contentions unpersuasive, we offer a bit of background.

## A.

ANILCA, enacted in 1980, offered new "protection[s] for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska, and at the same time provide[d] adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people." 16 U.S.C. § 3101(d). Summarized succinctly, "ANILCA is generally concerned with the designation, disposition, and management of land for environmental preservation purposes." *Stratman v. Leisnoi, Inc.*, 545 F.3d 1161, 1165 (9th Cir. 2008). To this end, Congress "set aside approximately 105 million acres of federal land in Alaska for protection of natural resource values by permanent federal ownership and management." *Nat'l Audubon Soc'y v. Hodel*, 606 F. Supp. 825, 827–28 (D. Alaska 1984). Portions of those lands were used to expand existing units of the National Park System and create new units, which were to be administered by the Secretary of the Interior. 16 U.S.C. § 410hh; *id.* § 410hh-1. Such units included national parks, preserves, and monuments. *See* 16 U.S.C. § 410hh; *id.* § 410hh-1. ANILCA refers to units of the National Park System situated in Alaska as "conservation system unit[s]" ("CSUs"). 16 U.S.C. § 3102(4).

Not all lands that lie within the boundaries of a CSU are owned by the federal government. Where possible, Congress drew unit boundaries "to include whole ecosystems and to follow natural features," and was thus cognizant of the fact that state, Native, or private-owned land could fall within the boundaries of CSUs. *Marsh*, 749 F.2d at 1417 (quoting

125 Cong. Rec. 9905 (1979)).   The presence of both federal-owned and nonfederal-owned land lying within CSUs led Congress to clarify two things: first, what land would actually comprise the CSUs, and second, more generally, how land falling within a CSU's boundaries–whether federally owned or not–could be regulated.  *See id.* (discussing the House version of ANILCA and the "Tsongas substitute" in the Senate).

Such clarification came in ANILCA § 103(c).  The full text of that subsection reads as follows:

> Only those lands within the boundaries of any conservation system unit which are public lands (as such term is defined in this Act) shall be deemed to be included as a portion of such unit.  No lands which, before, on, or after December 2, 1980, are conveyed to the State, to any Native Corporation, or to any private party shall be subject to the regulations applicable solely to public lands within such units.  If the State, a Native Corporation, or other owner desires to convey any such lands, the Secretary may acquire such lands in accordance with applicable law (including this Act), and any such lands shall become part of the unit, and be administered accordingly.

16 U.S.C. § 3103(c).

Section 103(c) thus contains three separate instructions regarding the composition and regulation of CSUs.  First, only "public lands" lying within the boundaries of a CSU are "deemed to be included as a portion of such unit."  *Id.*  Under

ANILCA, "public lands" are "[f]ederal lands" (including "lands, waters, and interests therein") in which the United States holds title after December 2, 1980. *Id.* § 3102(1)–(3). The first sentence of § 103(c) makes clear that the boundaries of CSUs "do[] not in any way change the status of that State, native, or private land" lying within those boundaries. 125 Cong. Rec. 11158 (1979).

The second sentence of § 103(c) declares that state, Native, and private-owned land shall not be subject to "regulations applicable solely to public lands within such units." 16 U.S.C. § 3103(c). Accordingly, under § 103(c)'s plain text, only public land lying within a CSU's boundaries may be subjected to *CSU-specific regulations*—nonfederal land is expressly made exempt from such regulations. As the 1979 Senate Report on ANILCA makes clear, nonfederal land would not be "subject to the management regulations which may be adopted to manage and administer any national [CSU] *which is adjacent to, or surrounds, the private or non-federal public lands*." S. Rep. No. 96-413, at 303 (1979), *reprinted in* 1980 U.S.C.C.A.N. 5070, 5247 (emphasis added). Importantly for purposes of this case, in contrast to CSU-specific regulations, "[f]ederal laws and regulations of general applicability to both private and public lands" are "unaffected," and "would be applicable to private or non-federal public land holdings within [CSUs]." *Id.*

Finally, § 103(c)'s third sentence provides that the Secretary of the Interior may acquire nonfederal land lying within a CSU's boundaries; such land would then "become part of the unit" and may "be administered accordingly." 16 U.S.C. § 3103(c). Once acquired, what was previously nonfederal land would no longer be free from "regulations applicable solely to public lands within [CSUs]." *Id.*; *see*

*also* 126 Cong. Rec. 21882 (1980) (noting that "if the [Native-]corporations ever decide to dispose of their property, [it] could become part of the [CSU]").

**B.**

With this background in mind, we easily resolve Sturgeon's appeal.  Sturgeon argues that the plain language of ANILCA § 103(c) removes nonfederal lands from the reach of federal regulations promulgated to manage public lands.  Thus, his argument goes, NPS may not enforce the hovercraft ban on the lower portion of the Nation River that falls within the Yukon-Charley because the water and submerged land of that river is owned by the state of Alaska.

While we agree with Sturgeon that § 103(c) is unambiguous, we find that it unambiguously forecloses his interpretation.  The plain text of § 103(c) only exempts nonfederal land from "regulations applicable *solely* to public lands within [CSUs]."   16 U.S.C. § 3103(c) (emphasis added).  The regulation at issue, banning hovercraft use in the Yukon-Charley, is not so limited.

In 1976, Congress vested the Secretary of the Interior with the authority to "[p]romulgate and enforce regulations concerning boating and other activities on or relating to waters located within areas of the National Park System, including waters subject to the jurisdiction of the United States."  16 U.S.C. § 1a-2(h).  Pursuant to this grant of authority, the Secretary promulgated a number of regulations to "provide for the proper use, management, government, and protection of persons, property, and natural and cultural resources within areas under the jurisdiction of the National Park Service." 36 C.F.R. § 1.1(a).  Within the chapter of the

Code of Federal Regulations containing those regulations, parts 1 through 5 "apply to all persons entering, using, visiting, or otherwise within" federally owned lands and waters administered by NPS and "[w]aters subject to the jurisdiction of the United States located within the boundaries of the National Park System, including navigable waters." 36 C.F.R. § 1.2(a)(1), (3). The hovercraft ban is located within part 2 of that chapter. *See* 36 C.F.R. § 2.17(e).

In short, then, the hovercraft ban is not one that "appli[es] solely to public lands within [CSUs]" in Alaska. 16 U.S.C. § 3103(c). Rather, this regulation applies to all federal-owned lands and waters administered by NPS nationwide, as well as all navigable waters lying within national parks. Thus, even assuming (without deciding) that the waters of and lands beneath the Nation River have been "conveyed to the State" for purposes of § 103(c), that subsection does not preclude the application and enforcement of the NPS regulation at issue. Because of its general applicability, the regulation may be enforced on both public and nonpublic lands alike within CSUs. Though Sturgeon might prefer a more robust regulatory exemption, we "must presume that a legislature says in a statute what it means and means in a statute what it says." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 461–62 (2002) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992)).[6]

---

[6] Because we resolve this case based on the plain text of the statute, we need not address whether our decisions in *John v. United States (Katie John III)*, 720 F.3d 1214 (9th Cir. 2013), *John v. United States (Katie John II)*, 247 F.3d 1032 (9th Cir. 2001) (en banc) (per curiam), or *State of Alaska v. Babbitt (Katie John I)*, 72 F.3d 698 (9th Cir. 1995) supply an alternative basis for affirming the district court.

**C.**

Sturgeon acknowledges that § 103(c)'s language exempts nonfederal lands from regulations applicable "solely" to public lands, but argues that overreliance on the word "solely" leads to a result contrary to the express legislative purpose of restricting federal authority over nonfederal land within CSUs. "When confronted with a statute which is plain and unambiguous on its face, we ordinarily do not look to legislative history as a guide to its meaning." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 n. 29 (1978); *see also Balen v. Holland Am. Line Inc.*, 583 F.3d 647, 653 (9th Cir. 2009) (quoting *North Dakota v. United States*, 460 U.S. 300, 312 (1983)) (internal quotation mark omitted) (stating that when statutory language is clear, its "language must ordinarily be regarded as conclusive"). But even if we consider the legislative history of ANILCA, we find no support for Sturgeon's claim. Rather, the legislative records from the House and Senate contain numerous statements supporting the plain language of the statute. The sponsor of § 103(c) in the House offered the view that his amendment "restate[d] and ma[de] clear" that nonfederal lands within CSUs would not be "subject to regulations which are applied to public lands which, in fact, are part of the unit." 125 Cong. Rec. 11158 (1979). The primary sponsor of ANILCA in the House declared that nonfederal land would not be constrained by "regulations applicable to the public lands within the specific conservation system unit." 125 Cong. Rec. 9905 (1979). The House Concurrent Resolution that added § 103(c) to ANILCA specified that "only public lands (and not State or private lands) are to be subject to the [CSU] regulations applying to public lands." 126 Cong. Rec. 30498 (1980). Finally, the Senate Report notes that §103(c) would exempt nonfederal land from "regulations which may be

adopted to manage and administer any [CSU] which is adjacent to, or surrounds, the private or non-Federal public lands." S. Rep. No. 96-413, at 303 (1979), *reprinted in* 1980 U.S.C.C.A.N. 5070, 5247.[7]  Rather than help Sturgeon, the legislative history confirms that ANILCA § 103(c) did not purport to exempt nonfederal lands within CSUs from generally applicable federal laws and regulations like the hovercraft ban.

### D.

Next, Sturgeon argues that our decision in *City of Angoon v. Marsh*, 749 F.2d 1413 (9th Cir. 1984), supports his interpretation.  Sturgeon's reliance on *Marsh*, however, is misplaced.  *Marsh* involved the interaction between two subsections of ANILCA § 503.  The first, § 503(b), established the Admiralty Island National Monument, which was composed of 921,000 acres "of public lands." *Id.* at 1416 (emphasis omitted) (quoting ANILCA, Pub. L. No. 96-487, § 503(b), 94 Stat. 2371 (1980)).  The second, § 503(d), stated that "[w]ithin the Monument[], the Secretary shall not permit the sale of [sic] harvesting of timber."  *Id.*

Reading these two subsections in conjunction, we held that the district court erred in finding that "all lands within the boundaries of a National Forest System Monument"–

---

[7] Sturgeon also claims that until 1996, NPS did not purport to have regulatory authority over state-owned lands and waters within CSUs, but in July 1996, NPS reversed course.  Even if so, NPS's current view comports with the text of the statute, and to the extent Sturgeon believes that NPS's purported change in position militates against deference, "[a]gency inconsistency is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework."  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

including private lands–"come within the harvesting prohibition of section 503(d)." *Id.* (emphasis omitted). We pointed out that under § 503(b), the Admiralty Island National Monument, "by definition, consists solely of public or federally owned lands." *Id.* Thus, § 503(d)'s use of the phrase "[w]ithin the Monument" was inapplicable "to *private lands* which are within the boundaries of a national forest conservation system unit." *Id.* (emphasis added and omitted).

*Marsh* clearly is inapposite to the present dispute. First, *Marsh*'s discussion of § 103(c) is largely dicta because that subsection was inapplicable to the timber harvesting ban at issue. While ANILCA § 103(c) refers to "regulations applicable solely to public lands within such units," § 503(d) imposes a statutory prohibition against timber harvesting. At most, *Marsh* drew inferences from § 103(c) for the purpose of determining the reach of § 503(d). *See id.* at 1418 (noting that the court examined sections 102, 103(c), 503(d), and 506(c) "harmoniously" to determine Congressional intent regarding the ban on timber harvesting). Second, *Marsh* offers little guidance in Sturgeon's case because, if promulgated as a regulation, § 503(d)'s ban on timber harvesting would fall under § 103(c)'s exception to the application of regulations applying solely to public lands, while NPS's hovercraft ban does not. Section 503(d) specifically refers to activities taking place "[w]ithin the Monument[]," and thus only limits conduct taking place on *public lands* within a specific CSU. For that reason, if promulgated as an agency regulation, its harvesting ban would qualify as a "regulation[] applicable solely to public lands within [CSUs]," and would be unenforceable on state, Native, or private-owned land under ANILCA § 103(c). As we noted above, NPS's hovercraft ban is not so constrained, and it applies to federally owned lands and waters

administered by NPS nationwide, as well as navigable waters within national parks.

## V.

We reject two additional arguments asserted by Sturgeon, that the Secretary of the Interior exceeded her statutory authority in promulgating the regulation at issue and that her action raises serious constitutional concerns.

## A.

The 1976 Park Service Administration and Improvement Act ("1976 Act") grants the Secretary of the Interior broad authority over boating and water-related activities within the National Park System.   That authorization provides as follows:

> [T]he Secretary of the Interior is authorized . . . [to] [p]romulgate and enforce regulations concerning boating and other activities on or relating to waters located within areas of the National Park System, including waters subject to the jurisdiction of the United States: *Provided*, That any regulations adopted pursuant to this subsection shall be complementary to, and not in derogation of, the authority of the United States Coast Guard to regulate the use of waters subject to the jurisdiction of the United States.

16 U.S.C. § 1a-2(h).  Sturgeon contends that the latter portion of this subsection restricts the Secretary's regulatory power

and does not permit her to regulate any and all activities on waters within national parks.

However, the plain text of the 1976 Act merely requires that any regulations promulgated by the Secretary *complement*, and not *derogate*, Coast Guard authority over waters subject to federal jurisdiction. It does not, as Sturgeon argues, limit the Secretary's regulatory authority to that enjoyed by the Coast Guard. The Oxford English Dictionary defines "complement" to mean "to supply what is wanting," 3 *Oxford English Dictionary* 610 (2d ed. 1989), and "derogate" to mean to "diminish," *id.* at 504. Thus, under the 1976 Act, the Secretary may regulate boating and other water-related activities taking place within the National Park System and its navigable waters so long as those regulations supplement and do not diminish the Coast Guard's authority.[8]

Indeed, the legislative history of the 1976 Act makes this clear. The concern regarding the regulatory authority of the Coast Guard was first raised by the Secretary of the Interior in a letter to the House Committee on Interior and Insular Affairs.[9] H.R. Rep. No. 94-1569, at 13 (1976), *reprinted in*

---

[8] Moreover, ANILCA § 1319 provides that "[n]othing in [the statute] shall be construed as . . . superseding, modifying, or repealing, except as specifically set forth in this Act, existing laws applicable to the various Federal agencies which are authorized to . . . *exercise licensing or regulatory functions in relation thereto*." 16 U.S.C. § 3207 (emphasis added).

[9] The Secretary of Transportation also submitted a letter to the House Committee "strongly object[ing]" to the fact that the bill as drafted "would authorize the Secretary of the Interior to promulgate and enforce boating regulations which relate to construction, performance, and equipment standards"–responsibility for which had been previously delegated to "the Secretary of the department in which the Coast Guard is operating." H.R.

1976 U.S.C.C.A.N. 4290, 4299.  The Secretary noted that the Coast Guard possessed existing authority to "promulgate and enforce regulations for the promotion of *safety of life and property on* . . . waters subject to the jurisdiction of the United States."  *Id.* (alteration in original) (emphasis added) (quoting 14 U.S.C. § 2(3)).  Because many waters within the National Park System were navigable, the Secretary noted that his agency would "exercise authority concurrent with the Coast Guard in many instances," and thus recommended an amendment clarifying that the bill's grant of regulatory authority would "not diminish the Coast Guard's authority under existing law to regulate boat design and safety."  *Id.* The remainder of the bill would still, however, grant her the authority "to regulate *recreational, commercial and other uses and activities* relating to all waters of the National Park System."  *Id.* (emphasis added).

The statute reflects just such a clarifying amendment.  *See* 16 U.S.C. § 1a-2(h).  Thus, both the plain text and the legislative history of the 1976 Act make clear that Sturgeon's argument that the Secretary of the Interior exceeded her statutory authority is without merit.

## B.

Finally, Sturgeon contends that the Secretary's exercise of her regulatory authority under the 1976 Act implicates "serious constitutional concerns."  Specifically, he raises the specter of potential violations of the Property and Commerce Clauses, though without offering any specifics as to how or why the NPS regulations contravene those clauses.  We

---

Rep. No. 94-1569, at 24 (1976), *reprinted in* 1976 U.S.C.C.A.N. 4290, 4310.

therefore decline to invalidate NPS's hovercraft ban on constitutional grounds because "[w]hatever the extent of the State's proprietary interest in [its] river[s], the pre-eminent authority to regulate the flow of navigable waters resides with the Federal Government." *New England Power Co. v. New Hampshire*, 455 U.S. 331, 338 n.6 (1982); *see also Alaska v. United States*, 545 U.S. 75, 116–17 (2005) (Scalia, J., concurring in part and dissenting in part) ("If title to submerged lands passed to Alaska, the Federal Government would still retain significant authority to regulate activities in the waters of Glacier Bay by virtue of its dominant navigational servitude, other aspects of the Commerce Clause, and even the treaty power.").

## VI.

We hold that even assuming that the waters of and lands beneath the Nation River have been "conveyed to the State" for purposes of ANILCA § 103(c), NPS's hovercraft ban is not a regulation that applies solely to public lands within CSUs in Alaska. Therefore, as to Sturgeon, we affirm the district court's grant of summary judgment in favor of the federal appellees. Because Alaska cannot establish standing on this record, we vacate the district court's judgment as to Alaska and remand with instructions that Alaska's action be dismissed for lack of subject matter jurisdiction.

**AFFIRMED IN PART, VACATED AND REMANDED IN PART.**