**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ORGANIZED VILLAGE OF KAKE; THE
BOAT COMPANY; ALASKA
WILDERNESS RECREATION AND
TOURISM ASSOCIATION; SOUTHEAST
ALASKA CONSERVATION COUNCIL;
NATURAL RESOURCES DEFENSE
COUNCIL; TONGASS CONSERVATION
SOCIETY; GREENPEACE, INC.;
WRANGELL RESOURCE COUNCIL;
CENTER FOR BIOLOGICAL
DIVERSITY; DEFENDERS OF
WILDLIFE; CASCADIA WILDLANDS;
SIERRA CLUB,
　　　　　　*Plaintiffs-Appellees*,

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE; UNITED STATES
FOREST SERVICE; TOM VILSACK, in
his official capacity as Secretary of
Agriculture; HARRIS SHERMAN, in
his official capacity as Under
Secretary of Agriculture of Natural
Resources and Environment; TOM
TIDWELL, in his official capacity as
Chief, USDA Forest Service,
　　　　　　*Defendants*,

No. 11-35517

D.C. No.
1:09-cv-00023-
JWS

OPINION

ALASKA FOREST ASSOCIATION, INC.,
*Intervenor-Defendant*,

and

STATE OF ALASKA,
*Intervenor-Defendant–Appellant.*

Appeal from the United States District Court
for the District of Alaska
John W. Sedwick, District Judge, Presiding

Argued and Submitted En Banc
December 16, 2014—Pasadena, California

Filed July 29, 2015

Before: Sidney R. Thomas, Chief Judge, and Harry
Pregerson, Alex Kozinski, William A. Fletcher, Richard C.
Tallman, Richard R. Clifton, Consuelo M. Callahan, Milan
D. Smith, Jr., Morgan Christen, Jacqueline H. Nguyen,
Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Hurwitz;
Concurrence by Judge Christen;
Dissent by Judge Callahan;
Dissent by Judge M. Smith, Jr.;
Dissent by Judge Kozinski

# SUMMARY[*]

## Environmental Law

The en banc court affirmed the district court's summary judgment in favor of the Organized Village of Kake, finding that the United States Department of Agriculture's promulgation of the Tongass National Forest Exemption to the Department's "Roadless Rule" (limiting road construction and timber harvesting in national forests) violated the Administrative Procedure Act; vacated the Tongass Exemption; and reinstated application of the Roadless Rule to the Tongass National Forest in Alaska.

The U.S. Department of Agriculture declined to appeal, but intervenor-defendant State of Alaska appealed. Under the National Forest Receipts program, Alaska has a right to twenty-five percent of gross receipts of timber sales from national forests in the State.

In 2001, the Department of Agriculture promulgated the Roadless Rule, and expressly refused to exempt the Tongass National Forest from the Rule (the "2001 Record of Decision"). In 2003, relying on the identical factual record complied in 2001, the Department reversed course and found that application of the Roadless Rule to Tongass was unnecessary. The Department's 2003 Record of Decision promulgated the Tongass Exemption.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The en banc court held that the effect of the Roadless Rule on Alaska's statutory entitlement to timber receipts meant that the State of Alaska had an interest in the judgment sufficient to establish Article III standing. The en banc court also held that the 2003 Record of Decision fell short of Administrative Procedure Act requirements. The en banc court further held that the Tongass Exemption was invalid because the Department failed to provide a reasoned explanation for contradicting the findings in the 2001 Record of Decision. As a remedy, the en banc court upheld the district court's reinstatement of the Roadless Rule which remained in effect and applied to the Tongass Forest.

Concurring, Judge Christen, joined by Chief Judge Thomas, wrote separately to voice her view that there was no indication that the district court judge who first ruled in this case decided it based on his own view, and this court did not do so either.

Dissenting, Judge Callahan would hold that Alaska does not have Article III standing to appeal, and the appeal should be dismissed for lack of appellate jurisdiction. Judge Callahan also joined Judge M. Smith's dissent on the merits, and would reverse and remand.

Dissenting, Judge M. Smith, joined by Kozinski, Tallman, Clifton, and Callahan, wrote that the Department of Agriculture followed President Bush's policy instructions when it amended the Roadless Rule in 2003, and the agency's explanations for its decisions easily met the requirements of *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 513–15 (2000) (holding that a court should not substitute its judgment for that of an agency and should uphold an agency decision where the agency's path may be reasonably discerned).

Judge M. Smith would hold that the Department was not arbitrary and capricious in 2003 when it exempted the Tongass National Forest from the Roadless Rule, and would reverse the district court's decision.  He would also remand to the district court to consider the Village's National Environmental Policy Act claims in the first instance.

Dissenting, Judge Kozinski joined Judge M. Smith's dissent in full, and wrote separately to note the glacial pace of administrative litigation.

**COUNSEL**

Dario Borghesan (argued), Assistant Attorney General, Anchorage, Alaska; Thomas E. Lenhart, Assistant Attorney General, Juneau, Alaska, for Intervenor-Defendant–Appellant State of Alaska.

Thomas S. Waldo (argued) and Eric P. Jorgensen, Earthjustice, Juneau, Alaska; Nathaniel S.W. Lawrence, Natural Resources Defense Council, Olympia, Washington, for Plaintiffs-Appellees.

Julie A. Weis, Haglund Kelley Jones & Wilder LLP, Portland, Oregon, for Amicus Curiae Alaska Forest Association, Inc.

**OPINION**

HURWITZ, Circuit Judge:

In 2001, the United States Department of Agriculture promulgated the "Roadless Rule," limiting road construction and timber harvesting in national forests.  The Department expressly found that exempting the Tongass National Forest from this Rule "would risk the loss of important roadless area [ecological] values."  Just two years later, relying on the identical factual record compiled in 2001, the Department reversed course, finding "[a]pplication of the roadless rule to the Tongass . . . unnecessary to maintain the roadless values."

The issue in this case is whether the Department sufficiently explained this dramatically changed finding.  Like the district court, we conclude that the Administrative Procedure Act requires a reasoned explanation for this change in course, and affirm the judgment below.

**I.**

**A.  The 2001 Roadless Rule**

Approximately one-third of National Forest Service lands, some 58.5 million acres, is designated by the Department of Agriculture as inventoried roadless areas.  *See* Special Areas; Roadless Area Conservation, 66 Fed. Reg. 3244, 3245 (Jan. 12, 2001) (to be codified at 36 C.F.R. §§ 294.10–294.14) (the "2001 ROD").  These "large, relatively undisturbed landscapes" have a variety of scientific, environmental, recreational, and aesthetic attributes and characteristics unique to roadless areas, which the Department refers to as "roadless values."  *Id.* at 3245, 3251.  As the 2001 ROD

explained, these include healthy watersheds critical for catching and storing water, protecting downstream communities from flooding, providing clean water for domestic and agricultural purposes, and supporting healthy fish and wildlife populations. *Id.* at 3245. Roadless area attributes also include habitats for threatened and endangered species, space for wilderness recreation, environments for research, traditional cultural properties and sacred sites, and defensive zones against invasive species. *Id.*

Inventoried roadless lands were historically managed through local- and forest-level plans. *Id.* at 3246–47. In 2000, citing the "costly and time-consuming appeals and litigation" that plagued this process, *id.* at 3244, the Department considered a national roadless lands policy that would look at "the 'whole picture' regarding the management of the National Forest System," *id.* at 3246–48. The Department undertook to answer two questions when it started this process. The first was whether to prohibit timber harvesting and road construction (or reconstruction) within inventoried roadless areas of our national forests. *Id.* at 3262. The second question recognized the unique nature of the Tongass National Forest, which, at 16.8 million acres, is the nation's largest national forest.[1] *Id.* The issue was whether to exempt the Tongass from the proposed Roadless Rule in whole or in part. *Id.* at 3262–63. Thus, the Department

---

[1] The Tongass is vitally important to the economy of Southeast Alaska; it supports significant timber and mining activity as well as commercial and recreational fishing, hunting, recreation, and tourism. The Tongass is also part of the Pacific coast ecoregion, which encompasses one fourth of the world's coastal temperate rainforests. *Id.* at 3254. The Tongass has a very high degree of ecosystem health, and a higher percentage of inventoried roadless acreage than any Forest Service region in the contiguous United States.

examined four alternatives for treating the Tongass under the Roadless Rule: applying any new rule to the Tongass with no exceptions (Tongass Not Exempt), excluding the Tongass from a new rule altogether (Tongass Exempt), postponing any decision on the application of a new rule to the Tongass until 2004 (Tongass Deferred), and applying some of the prohibitions of a new rule only to certain parts of the Tongass (Tongass Selected Areas). *Id.* No other national forest received such special consideration in the Department's nationwide assessment of the proposed Roadless Rule.

Given the unique importance of the Tongass and the many competing interests in its use and management, it was not surprising that thousands of public comments concerning the proposed rule were received, or that the Department gave the Tongass special consideration. *Id.* at 3248. Approximately 16,000 people attended 187 public meetings, and the Department received more than 517,000 comments on the proposed rule. *Id.* The 2001 ROD squarely recognized that adopting the Roadless Rule risked significant and negative local economic impact for the Tongass:

> With the recent closure of pulp mills and the ending of long-term timber sale contracts, the timber economy of Southeast Alaska is evolving to a competitive bid process. About two-thirds of the total timber harvest planned on the Tongass National Forest over the next 5 years is projected to come from inventoried roadless areas. If road construction were immediately prohibited in inventoried roadless areas, approximately 95 percent of the timber harvest within those areas would be eliminated.

*        *        *

> Based on the analysis contained in the [Final
> Environmental Impact Statement], a decision
> to implement the rule on the Tongass National
> Forest is expected to cause additional adverse
> economic effects to some forest dependent
> communities ([Final Environmental Impact
> Statement] Vol. 1, 3-326 to 3-350). During
> the period of transition, an estimated 114
> direct timber jobs and 182 total jobs would be
> affected. In the longer term, an additional 269
> direct timber jobs and 431 total jobs may be
> lost in Southeast Alaska.

*Id.* at 3254–55.

In light of these socio-economic concerns, the proposed
Roadless Rule suggested the Tongass Deferred option. *See*
Special Areas; Roadless Area Conservation, 65 Fed. Reg.
30,276, 30,277, 30,280–81 (May 10, 2000) (notice of
proposed rulemaking). But the 2001 ROD expressly found
that such an approach "would risk the loss of important
roadless area values" in the Tongass. 66 Fed. Reg. at 3254.
The 2001 ROD also rejected the Tongass Selected Areas
option, finding that even under that more limited approach,
"[i]mportant roadless area values would be lost or
diminished." *Id.* at 3266. Ultimately, the Department
adopted a national Roadless Rule prohibiting road
construction and timber harvesting in inventoried roadless
areas of the National Forest System except for specified
"human and environmental protection measures." *Id.* at
3263. The Department decided that the Roadless Rule would
apply to the Tongass, but with several exceptions designed to

mitigate the impacts of the Rule in Southeast Alaska. The exceptions allowed: (1) road construction and reconstruction in certain mineral-leasing areas, (2) timber harvest in areas where roadless characteristics had been substantially altered by road construction or timber harvest since the area was designated an inventoried roadless area but before implementation of the Roadless Rule, and (3) planned timber harvest and road construction in areas where a notice of availability of a draft environmental impact statement had been published in the Federal Register prior to publication of the Roadless Rule. *Id.* at 3266. The Department estimated that these exceptions would together allow enough continued timber harvest from the Tongass "to satisfy about seven years of estimated market demand." *Id.*

## B. The Roadless Rule Litigation

Although the Department intended the Roadless Rule to reduce litigation about forest management, *see id.* at 3244, 3246, that hope was promptly dashed. Litigation over the Roadless Rule began immediately after its adoption. In 2001, an Idaho district judge preliminarily enjoined implementation of the Roadless Rule, citing violations of the National Environmental Policy Act, 42 U.S.C. §§ 4321–4347 ("NEPA"). *Kootenai Tribe of Idaho v. Veneman*, No. 01-10-N-EJL, 2001 WL 1141275, at *2 (D. Idaho May 10, 2001). This court reversed, finding that plaintiffs had not shown a likelihood of success on their NEPA claim. *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1126 (9th Cir. 2002), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1178–80 (9th Cir. 2011) (en banc). The Roadless Rule took effect when the *Kootenai* mandate issued in April 2003. *See California ex*

*rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1007 (9th Cir. 2009) (describing history of the Roadless Rule).

The State of Alaska also challenged the Roadless Rule soon after its adoption. The State's complaint, filed in the District of Alaska in 2001, claimed that the promulgation of the Roadless Rule violated NEPA, the Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706 ("APA"), the Alaska National Interest Lands Conservation Act, 16 U.S.C. §§ 3101–3233 ("ANILCA"), the Tongass Timber Reform Act, Pub. L. No. 101-626, 104 Stat. 4426 (1990) (codified as amended in scattered sections of 16 U.S.C.) ("TTRA"), and other federal statutes. Complaint, *Alaska v. U.S. Dep't of Agric.*, No. 3:01-cv-00039-JKS (D. Alaska Jan. 31, 2001), ECF No. 1; *see also Organized Vill. of Kake v. U.S. Dep't of Agric.*, 776 F. Supp. 2d 960, 964 (D. Alaska 2011) (describing this litigation). The case settled, and Alaska's complaint was dismissed.[2] *Organized Vill.*, 776 F. Supp. 2d at 964.

Four months after this court decided *Kootenai*, the Roadless Rule was permanently enjoined by a Wyoming district court that found the rule violated both NEPA and the Wilderness Act, 16 U.S.C. §§ 1131–1136. *Wyoming v. U.S. Dep't of Agric.*, 277 F. Supp. 2d 1197, 1239 (D. Wyo. 2003), *vacated*, *Wyoming v. U.S. Dep't of Agric.*, 414 F.3d 1207, 1211, 1214 (10th Cir. 2005). While that ruling was on

---

[2] Alaska again challenged the validity of the Roadless Rule in 2011, this time in the District of Columbia. The district court found the action barred by the statute of limitations. *Alaska v. U.S. Dep't of Agric.*, 932 F. Supp. 2d 30, 33–34 (D.D.C. 2013). The D.C. Circuit reversed, holding that the limitations period had reset when the Roadless Rule was reinstated in 2006. *Alaska v. U.S. Dep't of Agric.*, 772 F.3d 899, 900 (D.C. Cir. 2014). This litigation remains pending.

appeal, the Department promulgated the "Special Areas; State Petitions for Inventoried Roadless Area Management" rule (the "State Petitions Rule").  70 Fed. Reg. 25,654 (May 13, 2005) (to be codified at 36 C.F.R. §§ 294.10–294.18).  The State Petitions Rule replaced the Roadless Rule with a process under which the "Governor of any State or territory that contains National Forest System lands" could "petition the Secretary of Agriculture to promulgate regulations establishing management requirements for all or any portion of National Forest System inventoried roadless areas within that State or territory." *Id.* at 25,661.  In light of the new rule, the Tenth Circuit dismissed the Department's appeal from the Wyoming district court judgment as moot and vacated the judgment. *Wyoming*, 414 F.3d at 1211, 1214.

A year later, however, a California district court set aside the State Petitions Rule, finding it invalid under NEPA and the Endangered Species Act, 16 U.S.C. §§ 1531–1544; the district court therefore reinstated the Roadless Rule. *California  ex rel. Lockyer v. U.S. Dep't of Agric.*, 459 F. Supp. 2d 874, 909, 912, 919 (N.D. Cal. 2006).  This court affirmed. *Lockyer*, 575 F.3d at 1021.  In 2008, a Wyoming district court again permanently enjoined the Roadless Rule. *Wyoming v. U.S. Dep't of Agric.*, 570 F. Supp. 2d 1309, 1355 (D. Wyo. 2008), *rev'd*, *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1272 (10th Cir. 2011).  In 2011, the Tenth Circuit once again reversed. *Wyoming*, 661 F.3d at 1272.

## C.  The Tongass Exemption

In return for Alaska's dismissal of its 2001 suit challenging the Roadless Rule, the Department agreed to publish (but not necessarily to adopt) a proposed rule, the "Tongass Exemption," to "temporarily exempt the Tongass

from the application of the roadless rule" as well as an advanced notice of proposed rulemaking to permanently exempt the Tongass and another Alaska national forest from the Roadless Rule. *See* Special Areas; Roadless Area Conservation; Applicability to the Tongass National Forest, Alaska, 68 Fed. Reg. 41,865, 41,866 (Jul. 15, 2003) (notice of proposed rulemaking). In December of 2003, the Department issued a record of decision (the "2003 ROD") promulgating the final Tongass Exemption, the "Special Areas; Roadless Conservation; Applicability to the Tongass National Forest, Alaska" rule. 68 Fed. Reg. 75,136 (Dec. 30, 2003) (to be codified at 36 C.F.R. § 294.14). The 2003 ROD expressly found that "the overall decisionmaking picture" was not "substantially different" from when the 2001 ROD was promulgated, *id.* at 75,141, and that public comments about the Tongass Exemption "raised no new issues . . . not already fully explored" in the earlier rulemaking, *id.* at 75,139. Thus, the Department relied on the 2001 Roadless Rule Final Environmental Impact Statement ("Roadless Rule FEIS"), rather than preparing a new one. *Id.* at 75,136, 75,141.

The 2003 ROD adopted the Tongass Exempt Alternative identified in the 2001 ROD, thus returning the Tongass to management through a local forest plan, the Tongass Forest Plan. *Id.* at 75,136. Contrary to the 2001 ROD, the 2003 ROD concluded "[a]pplication of the roadless rule to the Tongass is unnecessary to maintain the roadless values of these areas," *id.* at 75,137, which the Department found were already "well protected by the Tongass Forest Plan," *id*. at 75,144.

**D.  The Procedural History of This Case**

In 2009, the Organized Village of Kake and others (collectively, the "Village") filed this suit in the District of Alaska, alleging that the Tongass Exemption violated NEPA and the APA.  *See Organized Vill.*, 776 F. Supp. 2d at 967. The State of Alaska intervened as a party-defendant.  *Id.* at 961.  The district court granted summary judgment to the Village, finding the promulgation of the Tongass Exemption violated the APA, 5 U.S.C. § 706(2)(A), because "the Forest Service provided no reasoned explanation as to why the Tongass Forest Plan protections it found deficient in [2001], were deemed sufficient in [2003]." *Id.* at 974, 977.  The court thus vacated the Tongass Exemption and reinstated application of the Roadless Rule to the Tongass.[3]  *Id.* at 977.

The Department declined to appeal.  *See Organized Vill. of Kake v. U.S. Dep't of Agric.*, 746 F.3d 970, 973 (9th Cir. 2014).  Alaska, however, did appeal, and a divided three-judge panel of this court reversed the district court's APA ruling and remanded for consideration of the Village's NEPA claim.[4]  *Id.* at 973, 980.  A majority of the nonrecused active judges on this court then voted to grant the Village's petition for rehearing en banc.  *See Organized Vill. of Kake v. U.S. Dep't of Agric.*, 765 F.3d 1117 (9th Cir. 2014).

---

[3] Because the court found the Tongass Exemption invalid under the APA, it did not reach the Village's NEPA claim.  *Organized Vill.*, 776 F. Supp. 2d at 976.

[4] The Alaska Forest Association also intervened below, but did not appeal, instead filing a brief as amicus curiae.  Amicus Brief, *Organized Vill.*, No. 11-35517 (9th Cir. Nov. 1, 2011), ECF No.19.

## II.

### A. Jurisdiction

We begin, as we did in *Kootenai*, by examining "whether the intervenor[] may defend the government's alleged violations of . . . the APA when the federal defendants have decided not to appeal." 313 F.3d at 1107. Although the Village does not challenge Alaska's standing, that silence does not excuse us from determining whether we have appellate jurisdiction. *United Investors Life Ins. Co. v. Waddell & Reed Inc.*, 360 F.3d 960, 966–67 (9th Cir. 2004).[5]

"[I]ntervenors are considered parties entitled . . . to seek review," but "an intervenor's right to continue a suit in the absence of the party on whose side intervention was permitted is contingent upon a showing by the intervenor that he fulfills the requirements of Art. III." *Diamond v. Charles*, 476 U.S. 54, 68 (1986). To establish Article III standing, a party must demonstrate "injury in fact," causation, and redressability. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). When the original defendant does not appeal, "the test is whether the intervenor's interests have been adversely affected by the judgment." *Didrickson v. U.S. Dep't of Interior*, 982 F.2d 1332, 1338 (9th Cir. 1992).

Under the National Forest Receipts program, Alaska has a right to twenty-five percent of gross receipts of timber sales from national forests in the State. *See* 16 U.S.C. § 500.

---

[5] The D.C. Circuit did not question Alaska's standing in the litigation before that court about the 2001 ROD. *Alaska*, 772 F.3d at 899–900.

Accordingly, from 1970 through 2001, Alaska received more than $93 million in Tongass receipts. The permitted amount of timber harvesting in the Tongass is directly affected by the Tongass Exemption. *See* 2001 ROD, 66 Fed. Reg. at 3270 (finding that under the Roadless Rule, "[h]arvest effects on the Tongass National Forest will be reduced about 18 percent in the short-term" and "about 60 percent" in the long-term). The effect of the Roadless Rule on Alaska's statutory entitlement to timber receipts means that Alaska has an interest in the judgment, *Didrickson,* 982 F.2d at 1338, sufficient to establish Article III standing, *see Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160–61 (1981).

Our dissenting colleague argues that Article III standing is absent because "Congress did not intend to legislate standing" for a state under 16 U.S.C. § 500. This argument misses the mark. As the Supreme Court has recently made clear, whether Congress created a private cause of action in legislation is not a question of Article III standing. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386–88 & n.4 (2014). Notwithstanding that courts sometimes have mistakenly referred to this inquiry as involving "prudential standing," the Court has made plain that it "does not implicate subject-matter jurisdiction, *i.e.,* the court's statutory or constitutional *power* to adjudicate the case." *Id.* at 1387 & n.4 (internal quotation marks omitted) (noting that "prudential standing" is a "misnomer"). Here, Alaska does not pursue a claim under the National Forest Receipts program. Rather, this is an APA action initiated by the Village challenging the Tongass Exemption. In such an action, we apply the familiar "zone of interests" test. *Id.* at 1388–89. The Supreme Court has emphasized,

in the APA context, that the test is not especially demanding. In that context we have often conspicuously included the word "arguably" in the test to indicate that the benefit of any doubt goes to the plaintiff, and have said that the test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue. That lenient approach is an appropriate means of preserving the flexibility of the APA's omnibus judicial-review provision, which permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review. We have made clear, however, that the breadth of the zone of interests varies according to the provisions of law at issue, so that what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the generous review provisions of the APA may not do so for other purposes.

*Id.* at 1389 (citations and internal quotation marks omitted).

There can be no doubt that the Village more than amply met the forgiving "zone of interests" test when it instituted this APA action. That resolves the issue, because "[a]n intervenor's standing to pursue an appeal does not hinge upon whether the intervenor could have sued the party who

prevailed in the district court." *Didrickson*, 982 F.2d at 1338.[6]

Of course, Alaska must also have Article III standing. Thus, the only issue really before us is whether the judgment below threatens Alaska with an injury in fact that gives the State a "stake in defending . . . enforcement" of the Tongass Exemption sufficient to satisfy Article III. *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2663 (2013) (internal quotation marks omitted). In this respect, contrary to the dissent, *Energy Action Educational Foundation* is on all fours. Under the Outer Continental Shelf Lands Act Amendments of 1978 ("OCS"), the federal government was required to share revenues from a federal OCS lease with a state owning adjoining portions of an oil and gas pool. *Energy Action Educ. Found.*, 454 U.S. at 160–61. When California challenged the bidding system used for awarding federal leases, the Secretary of the Interior disputed the State's standing. *Id.* In finding that California alleged a potential injury sufficient to establish Article III standing, the Court relied expressly on the State's right to revenues under the 1978 OCS amendments:

> The 1978 Amendments require the Federal Government to turn over a fair share of the revenues of an OCS lease to the neighboring

---

[6] Even if we were required to determine whether Alaska satisfied the zone of interest test in this action, the answer would be the same. The State's interests in timber harvesting, road construction, and economic development are directly impacted by the Tongass Exemption, and are extensively discussed in the 2003 ROD. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (explaining that APA standing requires only that a party's interests be "marginally" related to the challenged action).

coastal State whenever the Federal
Government and the State own adjoining
portions of an OCS oil and gas pool.
California thus has a direct financial stake in
federal OCS leasing off the California coast.
In alleging that the bidding systems currently
used by the Secretary of the Interior are
incapable of producing a fair market return,
California clearly asserts the kind of distinct
and palpable injury that is required for
standing.

*Id.* at 160–61 (citations and internal quotation marks
omitted).[7]

The royalties due California under the OCS are
indistinguishable for Article III purposes from the fractional
timber receipts due Alaska under the National Forest Receipts
program. It is not disputed that reinstatement of the Roadless
Rule in the Tongass will limit timbering and thereby reduce
Alaska's statutory entitlement to fractional receipts. Alaska's
claimed injury is thus precisely the same kind of "injury in
fact" alleged by California with respect to the federal lease

---

[7] Contrary to the dissent, the Court did not rely on California's
ownership of adjacent oil deposits in finding a sufficient injury to establish
Article III standing. Although the Court properly noted that the OCS
required the Secretary "to use the best bidding systems and thereby assure
California a fair return for its resources," *Energy Action Educ. Found.*,
454 U.S. at 161, it did so when analyzing causation and redressability
*after* it had already found that California's right to statutory payment
established the requisite injury in fact.

bidding system—loss of funds promised under federal law—and satisfies Article III's standing requirement.[8]

To be sure, Alaska and its government subdivisions have elected since 2001 to receive payments under the Secure Rural Schools and Community Self-Determination Act of 2000, Pub. L. No. 106-393, 114 Stat. 1607, and successor legislation, in lieu of the fractional payments.[9]   But, Congress's current decision to protect beneficiaries of the National Forest Receipts program against declines in timbering revenues does not vitiate Alaska's Article III standing to challenge the reinstatement of the Roadless Rule. The Rule directly affects the size of Alaska's statutory entitlement to receipts from timbering, whether or not Congress chooses in any year to hold the state harmless against those losses, just as a plaintiff with an insurance policy has standing to sue a defendant who has damaged his home, even though in the end the insurer (or even the

---

[8] The dissent correctly does not contest that the causation and redressability prongs of Article III standing are satisfied here.

[9] The Secure Rural Schools Act was reauthorized numerous times before it briefly expired in 2014. *See* U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act § 5401, Pub. L. No. 110-28, 121 Stat. 112 (2007); Emergency Economic Stabilization Act § 601, Pub. L. No. 110-343, 122 Stat. 3765 (2008); Moving Ahead for Progress in the 21st Century Act § 100101, Pub. L. No. 112-141, 126 Stat. 405 (2012); Helium Stewardship Act of 2013 § 10(a), Pub. L. No. 113-40, 127 Stat. 534 (2013).  The Secure Rural Schools Act was reauthorized for two years on April 27, 2015. *See* Medicare Access and CHIP Reauthorization Act § 524, Pub. L. No. 114-10, 129 Stat. 87 (2015).

homeowner's uncle) has agreed to indemnify the homeowner for all losses.[10]

## B.  The APA claim

### 1.  The APA Requirements for a Change of Agency Policy

The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Agency action is "arbitrary and capricious if the agency has . . . offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Unexplained inconsistency" between agency actions is "a reason for holding an interpretation to be an arbitrary and capricious change."  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

The Supreme Court addressed the application of the APA to agency policy changes in *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).  In *Fox*, the Court held that a policy change complies with the APA if the agency (1) displays "awareness that it is changing position," (2) shows that "the new policy is permissible under the

---

[10] Because the Roadless Rule's impact on Alaska's right to fractional receipts under the National Forest Receipts program suffices to establish Article III injury in fact, we need not consider other possible bases for Article III standing.

statute," (3) "believes" the new policy is better, and (4) provides "good reasons" for the new policy, which, if the "new policy rests upon factual findings that contradict those which underlay its prior policy," must include "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 515–16 (emphasis omitted).

*Fox* involved the FCC's decision to treat isolated uses of non-literal profanity in television broadcasts as indecency, a reversal of agency policy. *Id.* at 508–10. Because the FCC had not based its prior policy on factual findings, but rather on its reading of Supreme Court precedent, the *Fox* majority did not explore the kind of "reasoned explanation" necessary to justify a policy change that rested on changed factual findings. *See id.* at 538 (Kennedy, J., concurring). But, Justice Kennedy, whose concurrence provided the fifth vote in the *Fox* 5–4 majority, plumbed this issue in his opinion. *See id.* at 535–39.

As a paradigm of the rule that a policy change violates the APA "if the agency ignores or countermands its earlier factual findings without reasoned explanation for doing so," Justice Kennedy cited *State Farm*. *Id.* at 537. That case involved congressional direction to an agency to issue regulations for "motor vehicle safety." *Id.* (quoting *State Farm*, 463 U.S. at 33). The agency issued a regulation requiring cars to have airbags or automatic seatbelts, finding that "these systems save lives." *Id.* at 537–38 (citing *State Farm*, 463 U.S. at 35, 37). After a change in presidential administrations, however, the agency rescinded the regulation, never addressing its previous findings. *Id.* at 538 (citing *State Farm*, 463 U.S. at 47–48). As Justice Kennedy noted, the "Court found the agency's rescission arbitrary and

capricious because the agency did not address its prior factual findings." *Id.* (citing *State Farm*, 463 U.S. at 49–51).

The central issue in this case is whether the 2003 ROD rests on factual findings contradicting those in the 2001 ROD, and thus must contain the "more substantial justification" or reasoned explanation mandated by *Fox*. *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015). We conclude that the 2003 ROD falls short of these APA requirements.

### 2. The Tongass Exemption Violated the APA

After compiling a detailed factual record, the Department found in the 2001 ROD that "the long-term ecological benefits to the nation of conserving these inventoried roadless areas outweigh the potential economic loss to [southeast Alaska] communities" from application of the Roadless Rule. 66 Fed. Reg. at 3255. On precisely the same record, the 2003 ROD instead concluded that the "the social and economic hardships to Southeast Alaska outweigh the potential long-term ecological benefits" of the Roadless Rule. 68 Fed. Reg. at 75,141. Alaska contends, and we agree, that the 2003 ROD is a change in policy.

We also agree with Alaska that the 2003 ROD complies with three of the *Fox* requirements. First, the Department displayed "awareness that it *is* changing position." *Fox*, 556 U.S. at 515. The 2003 ROD acknowledges that the Department rejected the Tongass Exemption in 2001 and recognizes that it is now "treating the Tongass differently." 68 Fed. Reg. at 75,139. Second, the 2003 ROD asserts that "the new policy is permissible" under the relevant statutes, ANILCA and TTRA. *Fox*, 556 U.S. at 515; 68 Fed. Reg. at 75,142. Third, we assume the Department "believes" the new

policy is better because it decided to adopt it.  *Fox*, 556 U.S. at 515 (emphasis omitted).

It is the Department's compliance with the fourth *Fox* requirement, that it give "good reasons" for adopting the new policy, upon which this case turns.  *Id.*  The 2003 ROD explicitly identifies the Department's reasons for "Going Forward With This Rulemaking" as "(1) serious concerns about the previously disclosed economic and social hardships that application of the rule's prohibitions would cause in communities throughout Southeast Alaska, (2) comments received on the proposed rule, and (3) litigation over the last two years."  68 Fed. Reg. at 75,137.  We examine below whether these constitute "good reasons" under the APA, and whether a factual finding contrary to the findings in the 2001 ROD underlays the Department's reasoning.

### i.  Socioeconomic Concerns

The 2003 ROD explains the Department's reversal of course as arising out of concern about "economic and social hardships that application of the [roadless] rule's prohibitions would cause in communities throughout Southeast Alaska." *Id.*  Those concerns were not new.  In both the 2001 and 2003 RODs, the Department acknowledged the "unique" socioeconomic consequences of the Roadless Rule for the timber-dependent communities of southeast Alaska. *See id.* at 75,139; 2001 ROD, 66 Fed. Reg. at 3266.  For this reason, the Roadless Rule included special mitigation measures—not added for any other national forest—allowing certain ongoing timber and road construction projects in the Tongass to move forward.  2001 ROD, 66 Fed. Reg. at 3266.  Moreover, both RODs incorporated potential job loss analysis from the

Roadless Rule FEIS.  *See* 2003 ROD, 68 Fed. Reg. at 75,137; 2001 ROD, 66 Fed. Reg. at 3255.

We do not question that the Department was entitled in 2003 to give more weight to socioeconomic concerns than it had in 2001, even on precisely the same record.  "*Fox* makes clear that this kind of reevaluation is well within an agency's discretion." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1038 (D.C. Cir. 2012).  There was a change in presidential administrations just days after the Roadless Rule was promulgated in 2001.  Elections have policy consequences.  But, *State Farm* teaches that even when reversing a policy after an election, an agency may not simply discard prior factual findings without a reasoned explanation.

That is precisely what happened here.  The 2003 ROD did not simply rebalance old facts to arrive at the new policy.  Rather, it made factual findings directly contrary to the 2001 ROD and expressly relied on those findings to justify the policy change.  The 2001 ROD explicitly found that wholly exempting the Tongass from the Roadless Rule and returning it to management under the Tongass Forest Plan "would risk the loss of important roadless area values," 66 Fed. Reg. at 3254, and that roadless values would be "lost or diminished" even by a limited exemption, *id.* at 3266.  The 2003 ROD found in direct contradiction that the Roadless Rule was "unnecessary to maintain the roadless values," 68 Fed. Reg. at 75,137, and "the roadless values in the Tongass are sufficiently protected under the Tongass Forest Plan," *id.* at 75,138.

There can be no doubt that the 2003 finding was a critical underpinning of the Tongass Exemption.  The 2003 ROD states that "[t]he Department has concluded that the social

and economic hardships to Southeast Alaska outweigh the potential long-term ecological benefits *because* the Tongass Forest Plan adequately provides for the ecological sustainability of the Tongass." *Id.* at 75,141–42 (emphasis added). The 2003 ROD also makes plain that "[t]his decision reflects the facts . . . that roadless values are plentiful on the Tongass and are well protected by the Tongass Forest Plan. The minor risk of the loss of such values is outweighed by the by the more certain socioeconomic costs of applying the roadless rule's prohibitions to the Tongass." *Id.* at 75,144.

Thus, contrary to the contentions of both Alaska and dissenting colleagues, this is not a case in which the Department—or a new Executive—merely decided that it valued socioeconomic concerns more highly than environmental protection. Rather, the 2003 ROD rests on the express finding that the Tongass Forest Plan poses only "minor" risks to roadless values; this is a direct, and entirely unexplained, contradiction of the Department's finding in the 2001 ROD that continued forest management under precisely the same plan was unacceptable because it posed a high risk to the "extraordinary ecological values of the Tongass." 66 Fed. Reg. at 3254. The Tongass Exemption thus plainly "rests upon factual findings that contradict those which underlay its prior policy." *Fox*, 556 U.S. at 515. The Department was required to provide a "reasoned explanation . . . for disregarding" the "facts and circumstances" that underlay its previous decision. *Id.* at 516; *Perez*, 135 S. Ct. at 1209. It did not.

Consistent with *Fox*, we have previously held that unexplained conflicting findings about the environmental impacts of a proposed agency action violate the APA. In *Humane Society of the United States v. Locke*, we confronted

a determination by the National Marine Fisheries Service that sea lions posed a "significant negative impact" on fish populations, and could therefore be "lethally removed." 626 F.3d 1040, 1045–46 (9th Cir. 2010). The agency had made four previous findings, however, that comparable or greater dangers to similar fish populations would *not* have a significant adverse impact. *Id.* at 1048. We found that the APA required the agency to provide a "rationale to explain the disparate findings." *Id.* at 1049 (citing *Fox*, 556 U.S. 502).

The same result is mandated here. The 2003 ROD does not explain why an action that it found posed a prohibitive risk to the Tongass environment only two years before now poses merely a "minor" one. The absence of a reasoned explanation for disregarding previous factual findings violates the APA. "An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate." *Fox*, 556 U.S. at 537 (Kennedy, J., concurring).

Of course, not every violation of the APA invalidates an agency action; rather, it is the burden of the opponent of the action to demonstrate than an error is prejudicial. *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010); *see also Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("This Court has said that the party that seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted." (internal quotation marks omitted)).

But the required demonstration of prejudice is "not . . . a particularly onerous requirement." *Shinseki*, 556 U.S. at 410.

"If prejudice is obvious to the court, the party challenging agency action need not demonstrate anything further." *Jicarilla*, 613 F.3d at 1121. Because the Department's 2003 finding that the threat to the environment from the Tongass Exemption had now become "minor" is the centerpiece of its policy change, the absence of a reasoned explanation for that new factual finding is not harmless error. *See Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1091–92 (9th Cir. 2011) (applying *Shinseki* prejudice review to rulemaking). The Tongass Exemption therefore cannot stand.

### ii.  The Department's Other Rationales

Although we conclude that the Tongass Exemption is invalid because the Department failed to provide a reasoned explanation for contradicting the findings in  the 2001 ROD, we also briefly consider the two other rationales offered by the Department. These rationales do not rest on factual findings contrary to the 2001 ROD, but neither withstands even the forgiving general requirement that the proffered reason for agency action not be "implausible." *State Farm*, 463 U.S. at 43.

The second of the three reasons given by the Department in the 2003 ROD for promulgating the Tongass Exemption was "comments received on the proposed rule." 68 Fed. Reg. at 75,137. But, the 2003 ROD expressly conceded that these "comments raised no new issues" beyond those "already fully explored in the [Roadless Rule FEIS]." *Id.* at 75,139. It is implausible that comments raising "no new issues" regarding alternatives "already fully explored" motivated the adoption of the final Roadless Rule.

The third rationale for the Tongass Exemption, "litigation over the last two years," *id.* at 75,137, fares no better. The 2003 ROD states that "[a]dopting this final rule reduces the potential for conflicts regardless of the disposition of the various lawsuits" over the Roadless Rule. *Id.* at 75,138. Alaska candidly conceded in its opening brief that the Tongass Exemption "obviously will not remove all uncertainty about the validity of the Roadless Rule, as it is the subject of a nationwide dispute and . . . nationwide injunctions." These other lawsuits involved forests other than the Tongass, so it is impossible to discern how an exemption for the Alaska forest would affect them. And, the Department could not have rationally expected that the Tongass Exemption would even have brought certainty to litigation about this particular forest. It predictably led to this lawsuit, and did not even prevent a separate attack by Alaska on the Roadless Rule itself.[11] At most, the Department deliberately traded one lawsuit for another.

## C. Remedy

"'Ordinarily when a regulation is not promulgated in compliance with the APA, the regulation is invalid.'" *Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005) (quoting *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995)); *see* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or

---

[11] The settlement of Alaska's 2001 suit against the Department required the department to promulgate an advance notice of proposed rulemaking to permanently exempt several national forests in Alaska from the Roadless Rule; the State's concerns with the Roadless Rule thus extend beyond the Tongass. *See* 2003 ROD, 68 Fed. Reg. at 75,136.

otherwise not in accordance with law . . . ."). "The effect of invalidating an agency rule is to reinstate the rule previously in force." *Paulsen*, 413 F.3d at 1008. A district court's reinstatement of a prior rule is reviewed for abuse of discretion. *Lockyer*, 575 F.3d at 1011, 1019–20.

Alaska argues, however, that because the remedy for an invalid rule is not the reinstatement of another invalid rule, *see Paulsen*, 413 F.3d at 1008, the district court abused its discretion reinstating the Roadless Rule because that Rule had been enjoined by the Wyoming district court both when the Tongass Exemption was promulgated and when the judgment below was entered. But, wholly aside from the obvious conflict between the first Wyoming district court judgment and our later opinion in *Lockyer*, 575 F.3d 999, the argument is of no avail. The Tenth Circuit vacated both Wyoming district court injunctions. *See Wyoming*, 661 F.3d at 1272; *Wyoming*, 414 F.3d at 1214. The Roadless Rule therefore remains in effect and applies to the Tongass.

### III.

We **AFFIRM** the judgment of the district court.

---

CHRISTEN, Circuit Judge, with whom THOMAS, Chief Circuit Judge, joins, concurring:

As the court's opinion recognizes, the Tongass is vitally important to Southeast Alaska. The court is equally express in acknowledging that changes of administration can indeed have consequences. Neither of these points is in dispute.

This case is unique because no new facts were presented between the time the Department of Agriculture adopted the Roadless Rule in 2001 and the time it reversed its decision in 2003.  The outcome of the case pivots on the undeniable:  the 2003 decision was contradicted by the agency's previous factual findings.  In 2001, the agency found that "[a]llowing road construction and reconstruction on the Tongass National Forest to continue unabated would risk the loss of important roadless area values."   Special Areas; Roadless Area Conservation, 66 Fed. Reg. 3,244, 3,254–55 (Dep't of Agric. Jan. 12, 2001) (to be codified at 36 C.F.R. §§ 294.10–294.14).  In 2003, the agency concluded that  "the social and economic hardships to Southeast Alaska outweigh the potential long-term ecological benefits *because the Tongass Forest Plan adequately provides for the ecological sustainability of the Tongass.*"  Special Areas; Roadless Area Conservation; Applicability to the Tongass National Forest, Alaska, 68 Fed. Reg. 75,136, 75, 141–42 (Dep't of Agric. Dec. 30, 2003) (to be codified at 36 C.F.R. § 294.14) (emphasis added).

The dissent suggests that the 2003 decision was likely the result of a change in administrations, and argues that the agency, "following the policy instructions of the new president," was free to weigh the same evidence and "simply conclude[] that the facts mandated different regulations than the previous administration."   Supreme Court authority directs otherwise.  Under *FCC v. Fox Television Stations, Inc.*, when a new policy is contradicted by an agency's previous factual findings, the law does not allow the agency to simply ignore the earlier findings.  556 U.S. 502, 516 (2009).  Instead, the law requires that the agency provide a reasoned explanation for changing course and adopting a position contradicted by its previous findings.  *Id.*

In this case, the agency was unable to defend its flip-flop when the case was argued in the district court, and the agency chose not to participate in the appeal. Despite the efforts of the intervenor, the record and arguments presented to the district court support its decision, which we affirm today.

I write separately to voice my view that there is no indication the conscientious district court judge who first ruled in this case decided it based on his own views, and our court does not do so either. Judges do not have the expertise to manage national forests, but we are often called upon to decide whether a federal agency followed correct procedures. Whether or not they are reflected in the headlines, our rulings in environmental cases sometimes have the result of permitting resources to be extracted, *e.g.*, *Jones v. Nat'l Marine Fisheries Serv.*, 741 F.3d 989 (9th Cir. 2013), roads to be constructed, *e.g.*, *Sierra Club v. BLM*, 786 F.3d 1219 (9th Cir. 2015), forests to be logged, *e.g.*, *Lands Council v. McNair*, 629 F.3d 1070 (9th Cir. 2010), or forests to be thinned to manage the risk of fire, *e.g.*, *Friends of the Wild Swan v. Weber*, 767 F.3d 936 (9th Cir. 2014). Other times, they do not. *See, e.g.*, *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 767 (9th Cir. 2014) (enjoining logging project while Forest Service completed supplemental environmental impact statement). Regardless of the outcome, the court's aim is to fairly and impartially apply the law when we entertain such procedural challenges. Because in this case the Department of Agriculture did not follow the rule articulated by the Supreme Court in *Fox*, I join the majority in affirming the district court's decision.

CALLAHAN, Circuit Judge, dissenting:

The State of Alaska appeals the District Court for the District of Alaska's decision setting aside the Departure of Agriculture's exemption of the Tongass National Forest from the Roadless Rule. The majority holds that Alaska has standing to appeal based on a statutory entitlement—an option to collect a share of the revenue the United States makes from timber harvested from national forests in Alaska. *See* 16 U.S.C. § 500 (creating the National Forest Receipts Program). But Alaska does not have standing based on this statutory interest. A statutory provision is insufficient to establish Article III standing where, as here, the right it creates has not been invaded, Congress did not intend to legislate standing, and no factual injury has been suffered. The majority strays well beyond Article III's confines in holding that Congress legislated standing by creating a revenue-sharing program. The majority alarmingly opens the door to governance of the nation's natural resources by injunction, but only to those groups powerful enough to secure a statutory entitlement tied to development of those resources. Moreover, Alaska has not lost any revenue or even alleged that it will receive less money from the federal government if the district court's decision stands. I respectfully dissent.

## I.

This Court's jurisdiction is limited by Article III of the Constitution to "cases" and "controversies." U.S. Const., Art. III, § 2. One element of the Constitution's case-or-controversy requirement is that a litigant must demonstrate standing to sue. *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013). The standing requirement is built on

separation-of-powers principles; it "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* The standing requirement "must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013) (citation omitted).

States generally may seek to bring suit in three capacities: (1) "proprietary suits," in which states sue like private parties to remedy a concrete, particularized injury; (2) "sovereignty suits," in which states, for example, seek adjudication of boundary or water rights; and (3) "*parens patriae* suits," in which states sue on behalf of their citizens.[1] *Alfred L. Snapp & Son v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 600 (1982). To establish standing to sue in a proprietary capacity a State, like other litigants, must meet the following, familiar requirements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural or hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third,

---

[1] States also may seek to protect their "quasi-sovereign" interests in such suits, but "evidence of actual injury is still required." *Sturgeon v. Masica*, 768 F.3d 1066, 1074 (9th Cir. 2014); *see also Snapp*, 458 U.S. at 607.

> it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (footnote and citations omitted).

Alaska's standing fails at the first step. Alaska has not demonstrated that reinstatement of the Roadless Rule's application to the Tongass has caused, or imminently will cause, the State an injury in fact. This is the "first and foremost" requirement of standing, *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997), "a hard floor of Article III jurisdiction that cannot be removed by statute." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009).

## II.

Alaska advances three interests for purposes of demonstrating injury in fact: (1) a statutory interest in "the flow of monies to the State via the National Forest Receipts Program"; (2) a procedural interest based on the fact that the Department of Agriculture "initiated the rulemaking [that led to the Tongass exemption] pursuant to a settlement agreement with the State"; and (3) a *parens patriae* interest in Alaskan jobs that are "tied to timber." None of these asserted harms satisfies Article III's injury-in-fact requirement.

## A.

The majority finds that Alaska has standing because of "the effect of the Roadless Rule on Alaska's statutory entitlement" under the National Forest Receipts Program to twenty-five percent of gross receipts of timber sales from

national forests in the State. Without the Tongass exemption, the majority explains, less timber will be harvested from the Tongass National Forest, thus potentially decreasing the amount of revenue that Alaska may receive under the National Forest Receipts Program. This statutory entitlement argument fails for at least two reasons.

### 1.

First, by creating a "statutory entitlement" to a share of federal timber revenue, Congress did not legislate the Article III standing of state and local governments to challenge federal natural resource management. The Supreme Court has strongly suggested that Congress cannot create injury in fact by legislative fiat—rather, a litigant must have suffered not only a violation of a legal right, but also a factual harm. *See, e.g.*, *Summers*, 555 U.S. at 497; *Lujan*, 504 U.S. at 578. But it still may be that "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973). We, for example, have held that a statutory provision may provide a litigant with Article III standing where (1) Congress indicated that it intended for the provision to create a statutory right by creating a "private cause of action to enforce" the provision, (2) the litigant's statutory right has been infringed, and (3) the litigant has also suffered a concrete, "de facto injury," albeit one that was previously inadequate at law. *Robins v. Spokeo, Inc.*, 742 F.3d 409, 412–13 (9th Cir. 2014), *cert. granted*, No. 13-1339, 2015 WL 1879778 (U.S. Apr. 27, 2015).

Even if Congress may legislate standing in some circumstances, however, it has not done so here. There is no indication in 16 U.S.C. § 500's text or history that Congress

intended to legislate state and municipal standing to challenge the federal government's management of national forests. *See Edwards v. First Am. Corp.,* 610 F.3d 514, 517 (9th Cir. 2010) ("Essentially, the standing question in such cases [where a litigant asserts standing based on a statutory right] is whether the . . . statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief.") (citation omitted), *cert. dismissed as improvidently granted*, 132 S. Ct. 2536 (2012).[2]  Indeed, in the 107 years since § 500 was enacted, no court has found that the law gives states standing to challenge actions or inactions that may reduce federal timber receipts.

Moreover, even if Congress intended for § 500 to confer a statutory right to revenue, the invasion of which constitutes injury in fact, the right does not entitle Alaska to standing here because it has not been infringed.  *See Linda R.S.*, 410 U.S. at 617 n.3 ("Congress may enact statutes creating legal rights, *the invasion of which creates standing*, even though no injury would exist without the statute." (emphasis added)).[3]  Section 500 entitles Alaska to a share of revenue

---

[2] Other courts have disagreed that a statutory provision can create standing in the absence of actual harm.  *See, e.g.*, *David v. Alphin*, 704 F.3d 327, 338–39 (4th Cir. 2013) ("[T]his theory of Article III standing is a non-starter as it conflates statutory standing with constitutional standing."); *see also Joint Stock Soc'y v. UDV N. Am., Inc.*, 266 F.3d 164, 176 (3d Cir. 2001) (Alito, J.).  To the extent that Congress may legislate Article III standing, however, it follows that a Court must employ the usual tools of statutory interpretation to determine if Congress intended for a statutory provision to create standing.

[3] *See also Warth v. Seldin*, 422 U.S. 490, 500 (1975) (same); *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1109 (9th Cir. 2002) ("To establish standing [to appeal], the defendant-intervenors must first show

generated, not a right to have revenue generated. *Alpine Cnty., Cal. v. United States*, 417 F.3d 1366, 1368 (Fed. Cir. 2005) (there is "no duty to generate revenue" under the National Forest Receipts Program).   Thus, Alaska's entitlement to a share of federal timber revenue has not been "invaded" by reinstatement of the Roadless Rule, even assuming that Alaska could show that the Roadless Rule will cause Alaska to receive less money from the federal government.

The majority conflates the injury-in-fact requirement with the zone-of-interest test in discussing *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014).  The zone-of-interest test asks whether an injury to a litigant that meets Article III's injury-in-fact requirement falls within the zone of interests protected by the substantive statute under which that litigant sues. *Id.* at 1387–89.  If not, the litigant's claim under that statute may not proceed.[4]  *Id.* at

---

that they have suffered an injury in fact, [which involves, among other things,] an invasion of a legally-protected interest . . . ." (quotation marks omitted)), *abrogated by Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011); *Consumer Watchdog v. Wisc. Alumni Research Found.*, 753 F.3d 1258, 1262 (Fed. Cir. 2014) (dismissing for lack of standing because, "[u]nlike the plaintiffs in the [Freedom of Information Act] and [Federal Election Campaign Act] cases, Consumer Watchdog was not denied anything to which it was entitled"), *cert. denied*, 135 S. Ct. 1401 (2015).

[4] For example, if Alaska had alleged that reinstatement of the roadless rule caused a State-owned timber business to suffer a financial loss, Alaska would have demonstrated an injury in fact for purposes of Article III standing.  However, this "purely economic interest" would fall outside of the zone of interests protected by the National Environmental Policy Act under our precedent. *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 940 (9th Cir. 2005).

1388–89 (explaining that "the zone-of-interests test is [a] tool for determining who may invoke [a] cause of action . . . ."). I agree with the majority that whether an injury in fact falls within a statute's zone of protected interests is not a jurisdictional question. *See id.* at 1387–88 & n.4.

This appeal presents a different, critical, and jurisdictional question that is rooted in Article III's case-or-controversy requirement: whether a statutory provision that has not been invaded and does not include a cause of action endows a litigant who has not suffered a de facto injury with Article III standing. The answer to this jurisdictional question is clearly no. Because Alaska's statutory right under § 500 has not been invaded, Alaska lacks both injury in law and injury in fact. Attempting to sidestep this problem, the majority suggests that Alaska does not need to demonstrate an injury in fact to maintain this appeal, it need only demonstrate a "stake in defending" the Tongass exemption. Maj. Op. 16–17, 19. This suggestion is contrary to controlling Supreme Court precedent and our circuit precedent. *Diamond v. Charles*, 476 U.S. 54, 66–69 (1986) (dismissing for lack of jurisdiction because a defendant intervenor did not demonstrate an injury in fact necessary to establish his standing to appeal); *Kootenai Tribe of Idaho*, 313 F.3d at 1109 ("To establish standing [to appeal], the defendant-intervenors must first show that they have suffered an injury in fact . . . .").

The prospective effects of the majority's decision are alarming. After today, states and many local governments presumably have standing, at least in the Ninth Circuit, to challenge federal actions and inactions that may result in, among other things, fewer trees being felled in federal forests, less oil, gas, and coal being extracted from federal mineral

estates, fewer cattle being turned out on public lands, or even the devaluation of federal land.  States and local communities get a share of revenue generated from these and many other federal resources.**5**   Surely by creating a revenue-sharing program tied to the development of natural resources Congress did not legislate state and municipal standing to challenge the pace and manner of the federal government's management of the nation's natural resources.

This case is not like *Watt v. Energy Action Education Foundation*, 454 U.S. 151(1981), the case on which the majority relies.  In *Watt*, California had standing based on its interest in "assur[ing] a fair return for *its* resources," specifically state-owned oil and gas reserves drained by drilling on adjoining federal leases.**6**  *Id.* at 161 (emphasis added); *see also id.* at 160 ("California . . . claim[ed] standing as an involuntary 'partner' with the Federal Government in the leasing of [Outer Continental Shelf (OCS)] tracts in which the underlying pool of gas and oil lies under both the OCS

---

**5** *See, e.g.*, 43 U.S.C. §§ 315b, 315i, 315m (Grazing Leases Payments); 7 U.S.C. § 1012 (National Grasslands Payment); 30 U.S.C. §§ 191, 355 (Mineral Leasing Payments); 43 U.S.C. § 1337(g) (Offshore Mineral Leasing Payment); 42 U.S.C. § 6506a (National Petroleum Reserve in Alaska Payment); 16 U.S.C. § 715s (Refuge Revenue Sharing Payment); 31 U.S.C. §§ 6901–6907 (Payments in Lieu of Taxes); 16 U.S.C. §§ 577g, 577g-1 (Payments to Minnesota); 43 U.S.C. § 1181f (Oregon and California Grant Lands Payments); 43 U.S.C. § 1181f-1 (Coos Bay Wagon Road Grant Fund Payment); P.L. 100-446, § 323 (Arkansas Smoky Quartz Payment).

**6** In *Watt*, California challenged the federal government's bidding system for lease sales allowing for oil and gas development of the Outer Continental Shelf.  California claimed that the bidding system was incapable of producing a fair market return for California's oil and gas drained by drilling on federal leases.  *Id.* at 160–61.

*and the 3-mile coastal belt controlled by California*."
(emphasis added)).   The very language that the majority
excerpts also makes it plain that California's standing was
based on the State's "own[ership of] adjoining portions of an
[OCS] oil and gas pool" and interest in securing a "fair
market return" for drainage of those State-owned resources.
Maj. Op. 19 (quoting *Watt*, 454 U.S. at 160–61).  Alaska has
not alleged injury to its interest in being fairly compensated
for or avoiding damage to *its* natural resources, which would
implicate an injury in fact.  *Watt*, 454 U.S. at 160–61.**[7]**

To be clear, the Supreme Court did *not* hold in *Watt*, as
suggested by the majority, that the revenue sharing required
by section 8(g) of the Outer Continental Shelf Lands Act, 43
U.S.C. § 1337(g)(2), provides states with standing to
challenge federal actions and inactions that may result in less
oil and gas being extracted from the federal OCS.  Rather,
section 8(g) embodies a state's interest in being fairly
compensated for development of the federal OCS that
diminishes the state's resources.  Absent harm to a state's
resources or an invasion of that state's right to be fairly
compensated for diminishment of those resources, section
8(g) does not support that state's standing to challenge federal

---

**[7]** *See also, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 522 (2007)
("Because the Commonwealth owns a substantial portion of the state's
coastal property," and "rising seas have already begun to swallow
Massachusetts' coastal land," it "has alleged a particularized injury in its
capacity as a landowner." (internal citation, quotation marks, and footnote
omitted)); *Wyoming v. U.S. Dep't of Agric.*, 570 F. Supp. 2d 1309, 1329
(D. Wyo. 2008), *rev'd on other grounds*, 661 F.3d 1209 (10th Cir. 2011)
(finding that "Wyoming has presented evidence that the Roadless Rule
will increase the risk of environmental harm to its thousands of acres of
state forest land that are adjacent to, or intermingled with, lands
designated by the Forest Service as inventoried roadless areas").

management of the OCS.[8]  *Watt* does not support Alaska's standing to appeal.

**2.**

Second, when Alaska appealed in June of 2011, Alaska had not lost *any* National Forest Receipts Program money and did not even allege that it would receive less money from the federal government as a result of the district court's decision setting aside the Tongass exemption.  This was no oversight.  Rather, as Alaska acknowledged in its declaration in support of its motion to intervene, it has for many years elected to forego its share of federal timber revenue in order to receive much larger federal funding under the Secure Rural Schools Program.  *See* Secure Rural Schools and Community Self-Determination Act of 2000, Pub. L. No. 106-393, 114 Stat.

---

[8] Section 8(g) can thus be viewed as an exercise of Congress's uncontroversial power to "expand standing by enacting a law enabling someone to sue on what was already a de facto injury to that person . . . ."  *Doe v. Nat'l Bd. of Med. Exam'rs*, 199 F.3d 146, 153 (3d Cir. 1999) (Becker, C.J., joined by Scirica and Alito, JJ.).  Congress may "elevat[e] to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law," *Lujan*, 504 U.S. at 578, or that were deemed incognizable as a prudential matter by the courts, *Warth*, 422 U.S. at 500 & n.12.  *See also Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000).  Section 500 is not such a statute; it does not elevate any de facto harm.  But section 8(g) does.  Section 8(g) was intended to provide states with fair and easily administered compensation for drainage of state oil and gas from common-pool reservoirs.  *See, e.g.*, H.R. Rep. No. 95-590, at 1550 (1977) (explaining that the statute was intended to resolve "the problem of drainage of state resources by a lessee operating on the Outer Continental Shelf"); H.R. Rep. No. 99-300 at 547 (1985) (explaining that an amendment of section 8(g) was necessary because case-by-case determinations of "'fair and equitable disposition' of the common pool revenues" had led to "lengthy litigation").

1607.[9]  Thus, for example, in fiscal year 2010—before the Tongass exemption had been set aside by the district court—Alaska would have been due only about $517,948 under the National Forest Receipts Program as compared to the $16,027,564.62 it was paid under the Secure Rural Schools Act Program.[10]

Stated simply, Alaska cannot show us the money.  Alaska has neither suffered a financial loss traceable to the district court's decision nor shown that such injury is "certainly impending." *Clapper*, 133 S. Ct. at 1147.  That Alaska might elect to receive payments under the National Forest Receipts Program at some unknown future date in the currently unforeseeable event that the Secure Rural Schools Program is discontinued is too "conjectural or hypothetical" and insufficiently "actual or imminent" of an injury to support Alaska's standing.  *Lujan*, 504 U.S. at 560; *see also, e.g.*, *Sturgeon*, 768 F.3d 1at 1075 ("Alaska's claims regarding its sovereign and proprietary interests lack grounding in a demonstrated injury. . . .  Any injury to Alaska's sovereign

---

[9] Congress created the Secure Rural Schools Act and has continued to reauthorize it, *see* Maj. Op. 21 n.9, because "precipitously" declining timber revenue from national forests had decreased "the revenues shared with the affected counties."  Pub. L. No. 106-393 § 2(a)(9)–(10), 114 Stat. 1607 (Oct. 30, 2000).

[10] This data is available on the U.S. Forest Service's website, http://www.fs.usda.gov/main/pts/securepayments/projectedpayments (last visited June 18, 2015), and taken specifically from the "View ASR 10-1 FY2010" spreadsheet and "all counties FY 2010" tab of the "Estimated 25-percent payments, FY 2008–FY2010" spreadsheet.

and proprietary interest is pure conjecture and thus insufficient to establish standing.").[11]

Alaska's entitlement under 16 U.S.C. § 500 to a share of federal timber revenue does not give it standing to maintain this appeal.

## B.

Alaska also alleges injury to what it characterizes as a procedural interest in the Tongass exemption. Alaska states that the Department of Agriculture "initiated the rulemaking [that resulted in the Tongass exemption] pursuant to a settlement agreement with the State." This interest is not an injury in fact. First, Alaska has not alleged that its rights under the settlement agreement have been violated. As the settlement agreement required, the Department of Agriculture initiated the rulemaking and published the resulting rule. Second, even assuming that Alaska has alleged a violation of a relevant procedural right, Alaska cannot establish its standing to appeal based on a procedural interest alone. It is well established that "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient . . . ." *Summers*, 555 U.S. at 496; *see also Sturgeon*, 768 F.3d at 1075. Thus, Alaska's asserted legal interests do not demonstrate an injury in fact.

---

[11] The majority's analogy to the loss of one's home due to a neighbor's negligence misses the point. Loss of one's home is an injury in fact. A statutory financial entitlement untethered to a violation of that entitlement and an actual or imminent financial loss traceable to that violation is not.

## C.

Without an injury of its own, Alaska attempts to invoke someone else's injury. Alaska asserts that it has standing because "Alaska jobs are tied to timber." This general interest in the employment of its citizens is a *parens patriae* interest.[12] However, "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." *Snapp*, 458 U.S. at 610 n.16. That is because "it is no part of [a State's] duty or power to enforce [its citizens'] rights in respect of their relations with the Federal Government. In that field it is the United States, and not the State, which represents them as *parens patriae*." *Id*. (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923)).

Alaska lacks *parens patriae* standing in this case for another reason. Alaska has not shown, as it must, that directly interested private parties—Alaskans and companies interested in jobs tied to Tongass timber—could not represent themselves. *See, e.g.*, *Snapp*, 458 U.S. at 607 ("In order to maintain such an action, the State must articulate an interest apart from the interests of particular private parties . . . ."); *Sturgeon*, 768 F.3d at 1075 n.4; *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 970–71 (9th Cir. 2009). These groups are entirely capable of representing themselves. Indeed, the Alaska Forest Association, a trade association for the timber industry in Alaska, intervened in the district court but decided

---

[12] *See, e.g.*, *City of Rohnert Park v. Harris*, 601 F.2d 1040, 1044–45 (9th Cir. 1979) (alleged "loss of investment profits and tax revenues" by citizens if development did not proceed implicates a *parens patriae* interest); *Pennsylvania v. Kleppe*, 533 F.2d 668, 671 (D.C. Cir. 1976) ("[A]lleged injuries to the state's economy and the health, safety, and welfare of its people clearly implicate the *parens patriae* rather than the proprietary interest of the state.").

not to appeal. Alaska's interest in protecting the jobs of Alaskans and the bottom line of the timber industry is an insufficient *parens patriae* interest to support its standing to appeal.

Alaska has not satisfied the injury-in-fact requirement. Its alleged injuries fail to ensure that the decision to appeal has not been "placed in the hands of 'concerned bystanders,' who will use it simply as a 'vehicle for the vindication of value interests'" or party politics, rather than to remedy actual or imminent harm. *Hollingsworth*, 133 S. Ct. at 2663 (citing *Diamond*, 476 U.S. at 62). This appeal should be dismissed for lack of jurisdiction.

## III.

As the majority finds that this Court has jurisdiction and thus decides this appeal on the merits, I must reach the merits too. The same concern with the judiciary's limited role compels me to join Judge M. Smith's dissent on the merits. Congress in the Administrative Procedure Act did not authorize a judge, or even an en banc panel of judges, to set aside an agency decision because the reasons the agency proffered for the decision were not, from the viewpoint of the bench, "good" enough. Rather, an agency's decision must stand if it is not "arbitrary or capricious." 5 U.S.C. § 706. The Supreme Court's decision in *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–16 (2009), does not hold otherwise. *See, e.g.*, *White Stallion Energy Ctr. LLC v. EPA*, 748 F.3d 1222, 1235 (D.C. Cir. 2014) (judicial review of a "change in agency policy is no stricter than our review of an initial agency action" (citing *Fox*, 556 U.S. at 514–16)). *Fox* holds that an agency must "provide reasoned explanation for its action," which normally requires "that it display awareness

that it is changing position." *Fox*, 556 U.S. at 515 (emphasis omitted); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem.").

Here, the Department of Agriculture met *Fox*'s requirement by acknowledging that it was changing its mind. The Department also met the APA's requirements by explaining that the exemption would allow for a better balance between environmental preservation, road access, and timber availability. The balance the Department struck is reasonable and well within its mandate under the National Forest Management Act and the Tongass Timber Reform Act to "provide for multiple use and sustained yield" of forest resources. 16 U.S.C. §§ 539d(1), 1604(e)(1).

"Litigation over the last two years" was not, as the majority suggests, an extra-statutory weight that entered into the Department's "enormously complicated task of striking a balance among the many competing uses to which land can be put." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004) (addressing the Bureau of Land Management's similar statutory charge). Rather, litigation was part of what prompted the Department to consider striking a different balance.

The significance of the Tongass exemption's foreseeable environmental and socioeconomic impacts did enter into that balance, and were detailed by the Department in its Environmental Impact Statement (EIS) and discussed in its Record of Decision. The majority latches onto one word in setting aside the Department's decision. It faults the

Department for calling the risk to roadless values—one of the many natural resources provided by the Tongass—"minor." *See* 68 Fed. Reg. 75,136, 75,144 (Dec. 30, 2003). It is clear, however, that the Department was not tossing aside its analysis of the significance of environmental impacts set forth in the EIS. Instead, after further consideration, the Department found that the loss of some roadless values did not outweigh "the socioeconomic costs of applying the roadless rule's prohibitions to the Tongass." *Id.* The Department's explanation of its balance was not arbitrary or capricious.

## IV.

I would dismiss this case for lack of appellate jurisdiction. Stuck with the majority's finding that this Court has jurisdiction, I would reverse and remand.

---

M. SMITH, Circuit Judge, with whom KOZINSKI, TALLMAN, CLIFTON, and CALLAHAN, Circuit Judges, join, dissenting:

Elections have legal consequences. When a political leader from one party becomes president of the United States after a president from another party has occupied the White House for the previous term, the policies of the new president will occasionally clash with, and supplant, those of the previous president, often leading to changes in rules promulgated pursuant to the Administrative Procedure Act (APA), Pub. L. No. 79-404, 60 Stat. 237 (1946) (codified as amended at 5 U.S.C. § 701 *et seq.*). *See, e.g., Animal Legal Def. Fund v. Veneman*, 469 F.3d 826, 830–31 (9th Cir. 2006)

(withdrawal under President George W. Bush of agricultural policy announced under President Clinton), *vacated en banc*, 490 F.3d 725 (9th Cir. 2007); *Natural Res. Def. Council, Inc. v. U.S. Envtl. Prot. Agency*, 824 F.2d 1146, 1149 (D.C. Cir. 1987) (withdrawal under President Reagan of an emission standard from President Carter's administration), *vacated*, 817 F.2d 890 (D.C. Cir. 1987); *Farmworker Justice Fund, Inc. v. Brock*, 811 F.2d 613, 617 (D.C. Cir. 1987), *vacated sub nom.*, *Farmworkers Justice Fund, Inc. v. Brock*, 817 F.2d 890 (D.C. Cir. 1987) (withdrawal by President Reagan's Secretary of Labor of sanitation standard proposed under President Carter); Press Release, Department of the Interior, Salazar and Locke Restore Scientific Consultations under the Endangered Species Act To Protect Species and Their Habitats (Apr. 28, 2009), *available at* 2009 WL 1143690 (withdrawal by President Obama's Secretary of Commerce and Secretary of Interior of rule pertaining to consultation of federal wildlife experts proposed under President George W. Bush).

This phenomenon is particularly common in the period between the last few months of an outgoing administration and the first few months of an incoming administration, as was the case here.  Recent legal scholarship has shed light on the concept of "midnight regulations," whereby, during their final period in office, outgoing administrations accelerate rulemaking and agency actions, which incoming administrations then attempt to stay and reverse. *See* Jack M. Beermann, *Midnight Rules: A Reform Agenda*, 2 Mich. J. Envtl. & Admin. L. 285 (2013); Jacob E. Gersen & Anne Joseph O'Connell, *Hiding in Plain Sight? Timing and Transparency in the Administrative State*, 76 U. Chi. L. Rev. 1157, 1196 (2009); Anne Joseph O'Connell, *Agency Rulemaking and Political Transitions*, 105 Nw. U. L. Rev.

471 (2011).  For example, on President Obama's first day in office, Chief of Staff Rahm Emanuel issued a memo to the heads of federal agencies mandating that they stop the publication of regulations unless they obtained approval of the new administration.  *See* Memorandum from Rahm Emanuel, Assistant to the President and Chief of Staff, the White House, to Heads of Executive Departments and Agencies (Jan. 20, 2009), in 74 Fed. Reg. 4435 (Jan. 26, 2009).  On the first day of President George W. Bush's presidency, Chief of Staff Andrew Card similarly directed agencies to stop all regulatory notices.  *See* Memorandum from Andrew H. Card, Jr., Assistant to the President and Chief of Staff, the White House, to Heads and Acting Heads of Executive Departments and Agencies (Jan. 20, 2001), in 66 Fed. Reg. 7702 (Jan. 24, 2001).

Inevitably, when the political pendulum swings and a different party takes control of the executive branch, the cycle begins anew.  There is nothing improper about the political branches of the government carrying out such changes in policy.  To the contrary, such policy changes are often how successful presidential candidates implement the very campaign promises that helped secure their election.  That is simply the way the modern political process works.

On the other hand, when party policy positions clash, it is improper and unwise for members of the judiciary to decide which *policy* view is the better one, for such action inevitably throws the judiciary into the political maelstrom, diminishes its moral authority, and conflicts with the judicial role envisioned by the Founders.  As the Supreme Court has cautioned, "[i]t is hostile to a democratic system to involve the judiciary in the politics of the people.  And it is not less pernicious if such judicial intervention in an essentially

political contest be dressed up in the abstract phrases of the law." *Colegrove v. Green*, 328 U.S. 549, 553–54 (1946), *overruled on other grounds by Baker v. Carr*, 369 U.S. 186 (1962).

This case involves a clash between the policies of the outgoing Clinton administration and those of the incoming George W. Bush administration. The two presidents viewed how certain aspects of the laws governing national forests should be implemented very differently. On October 13, 1999, President Clinton issued a memo to the Secretary of Agriculture, instructing him "to develop, and propose for public comment, regulations to provide appropriate long-term protection for most or all of [the] currently inventoried 'roadless' areas." The United States Department of Agriculture (USDA) followed those instructions in promulgating the Roadless Area Conservation Rule, 66 Fed. Reg. 3244 (Jan. 12, 2001) (the Roadless Rule). In keeping with President Clinton's policies, the Roadless Rule emphasized "prohibit[ing] road construction, reconstruction, and timber harvest in inventoried roadless areas because they have the greatest likelihood of altering and fragmenting landscapes, resulting in immediate, long-term loss of roadless area values and characteristics." *Id.*

In November 2001, after President Bush took office and sought to implement his own policy preferences respecting national forests, the USDA began a process of "reevaluating its Roadless Area Conservation Rule." The USDA believed that "the abundance of roadless values on the Tongass, the protection of roadless values included in the Tongass Forest Plan, and the socioeconomic costs to local communities of applying the roadless rule's prohibitions to the Tongass, all warrant treating the Tongass differently from the national

forests outside of Alaska." Roadless Area Conservation; Applicability to the Tongass National Forest, Alaska, 68 Fed. Reg. 75,136, 75,139 (Dec. 30, 2003) (Tongass Exemption herein). It also found that "[t]he repercussions of delaying the project planning process regarding road building and timber harvest [in the Tongass], even for a relatively short period, can have a significant effect on the amount of timber available for sale in the next year." Slide Ridge Timber Sale Environmental Impact Statement, 66 Fed. Reg. 58710-01 (Nov. 23, 2001). The USDA ultimately modified the Clinton-era Roadless Rule due to, among other reasons, "(1) serious concerns about the previously disclosed economic and social hardships that application of the rule's prohibitions would cause in communities throughout Southeast Alaska, (2) comments received on the proposed rule, and (3) litigation over the last two years." Tongass Exemption, 68 Fed. Reg. at 75,137.

While the APA requires a reasoned explanation for a change in policy, "a court is not to substitute its judgment for that of the agency and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–15 (2009) (internal citation and quotation marks omitted). The USDA followed President Bush's policy instructions when it amended the Roadless Rule in 2003, 68 Fed. Reg. 75,136 (Dec. 30, 2003), and the agency's explanation for its decision *easily* meets the requirements of *Fox*. Unfortunately, it appears that, contrary to the requirements of *Fox*, the majority has selected what it believes to be the better *policy*, and substituted its judgment for that of the agency, which was simply following the political judgments of the new administration. Accordingly, I respectfully dissent.

## I.   The USDA's 2003 Change in Policy

Without acknowledging that the factual findings in the 2003 Record of Decision (ROD) rest on different policy views than those in the 2001 ROD, the majority argues that "[t]he Tongass Exemption thus plainly 'rests upon factual findings that contradict those which underlay [the agency's] prior policy.'"  This conclusion is simply incorrect.  The agency, following the policy instructions of the new president, weighed some of the facts in the existing record differently than had the previous administration, and emphasized other facts in the record that the previous administration had not.    Stated differently, the two administrations looked at some of the same facts, and reached different conclusions about the meaning of what they saw. The second administration simply concluded that the facts called for different regulations than those proposed by the previous administration.

There is little dispute that the underlying facts analyzed by the USDA had not changed meaningfully between November 2000, when the USDA completed the original rule's Final Environmental Impact Statement (FEIS), and 2003.  The USDA acknowledged as much when it considered the environmental impact of the Tongass Exemption in 2003. It concluded that "the identified new information and changed circumstances do not result in significantly different environmental effects from those described in the roadless rule FEIS.  Such differences as may exist are not of a scale or intensity to be relevant to the adoption of this final rule or to support selection of another alternative from the roadless rule FEIS.  Consequently, the overall decisionmaking picture is not substantially different from what it was in November

2000, when the roadless rule FEIS was completed." 68 Fed. Reg. at 75,141.

Nor had the facts underlying the USDA's assessment of the socioeconomic impact of the Tongass Exemption changed meaningfully by 2003; the USDA simply prioritized different aspects of the same socioeconomic data that it had considered in 2000. In the original Roadless Rule, the USDA had found that "[c]ommunities with significant economic activities in these sectors could be adversely impacted. However, the effects on national social and economic systems are minor. . . . None of the alternatives are likely to have measurable impacts compared to the broader social and economic conditions and trends observable at these scales, however the effects of the alternatives are not distributed evenly across the United States." 66 Fed. Reg. at 3261. In the 2003 ROD, on the other hand, the USDA assigned greater importance to the adverse socioeconomic impact of the Roadless Rule: "This decision reflects the facts, as displayed in the FEIS for the roadless rule and the FEIS for the 1997 Tongass Forest Plan that roadless values are plentiful in the Tongass and are well protected by the Tongass Forest Plan. The minor risk of the loss of such values is outweighed by the more certain socioeconomic costs of applying the roadless rule's prohibitions to the Tongass. Imposing those costs on the local communities of Southeast Alaska is unwarranted." 68 Fed. Reg. at 75,144. In 2003, then, the USDA concluded that it was important to give greater weight to *some* adverse socioeconomic effects than was done when the original Roadless Rule was promulgated.

Given the substantial similarity between the facts the USDA weighed in the 2003 ROD and those it weighed in the 2001 ROD, it is abundantly clear that the differences between

the two are the result of a shift in policy. After analyzing essentially the same facts, the USDA changed policy course at the direction of the new president, prioritizing some outcomes over others. *Fox* fully envisions such policy changes. It directs courts to uphold regulations that result from such changes, even if the agency gives an explanation that is of "less than ideal clarity," as long as "the agency's path may reasonably be discerned." *Fox*, 556 U.S. at 513–14 (internal quotation marks and citation omitted). That requirement is clearly met here.

## II. The USDA Was Not Arbitrary and Capricious

The APA requires that we set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In 2003, the USDA carefully reconsidered the facts before it, going through a full notice-and-comment process before exempting the Tongass National Forest from the Roadless Rule. The USDA was not arbitrary and capricious in making this decision.

The majority contends that the USDA does not meet a key requirement under *Fox*—that an "agency must show that there are good reasons for the new policy." 556 U.S. at 515. Respectfully, the majority misconstrues *Fox*. Under *Fox*, an agency "need not demonstrate to a court's satisfaction that *the reasons for the new policy* are *better* than the reasons for the old one*; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, *which the conscious change of course adequately indicates*." *Id.* (emphases added).

Accordingly, although the USDA only needed one good reason to change its policy, it had four independent ones, all of which are supported by the 2003 ROD: (1) resolving litigation by complying with federal statutes governing the Tongass, (2) satisfying demand for timber, (3) mitigating socioeconomic hardships caused by the Roadless Rule, and (4) promoting road and utility connections in the Tongass.

## A.  Litigation and Statutory Compliance

The USDA promulgated the exemption to the Roadless Rule in part to comply with statutes governing the Tongass and in response to lawsuits challenging the Roadless Rule. The Supreme Court has suggested that it is appropriate for an agency to engage in new rulemaking when litigation reveals new information. *See Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 741 (1996) ("Nor does it matter that the regulation was prompted by litigation, including this very suit."). This is precisely what occurred here:  A number of lawsuits filed against the USDA brought to light issues concerning potential conflicts between the Roadless Rule, the Alaska National Interest Lands Conservation Act (ANILCA), Pub. L. No. 96-487, 94 Stat. 2371 (1980), and the Tongass Timber Reforms Act (TTRA), Pub L. No. 101-626, 104 Stat. 4426 (1990).  The majority focuses on the fact that the 2003 ROD engendered new litigation, and concludes that it was therefore arbitrary and capricious for the USDA to act in response to the earlier litigation.  However, the fact that the 2003 ROD led to additional litigation says very little about whether the earlier litigation pointed to legitimate issues regarding the Roadless Rule's compliance with various statutes ordering preservation of an adequate supply of timber to Southeast Alaskan communities whose inhabitants depend on it for their livelihood.  The agency acted well within the

bounds of its authority if it believed that revising the Roadless Rule would ensure compliance with the statutory mandates that had generated the original litigation.

We have previously concluded that ANILCA and TTRA require that the USDA balance multiple goals in the Tongass: "recreation, environmental protection, and timber harvest." *Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 808 & n.22 (9th Cir. 2005). The USDA's 2003 ROD clearly finds that the Tongass Exemption was meant to bring the Roadless Rule in line with the purposes of ANILCA and TTRA. The USDA noted that, under ANILCA, Congress placed 5.5 million acres of Tongass in permanent wilderness status and the designation of disposition of lands in the act "represent[s] a proper balance between the reservation of national conservation system units and those public lands necessary and appropriate for more intensive use and disposition." 68 Fed. Reg. at 75,142. The USDA also stated that TTRA requires it to ensure that enough timber is available to "meet[] the annual market demand for timber" and "meet[] the market demand from the forest for each planning cycle . . . ." 68 Fed. Reg. at 75,140.

After promulgating the revised Roadless Rule, the USDA issued a press release stating that the Tongass Exemption sought to maintain "the balance for roadless area protection struck in the Tongass Land Management Plan." The 2003 ROD also concluded that "[t]his final rule reflects the Department's assessment of how to best implement the letter and spirit of congressional direction along with public values, in light of the abundance of roadless values on the Tongass, the protection of roadless values already included in the Tongass forest plan, and the socioeconomic costs to local

communities of applying the roadless rule's prohibitions." 68 Fed. Reg. at 75,142.

I do not suggest that ANILCA and TTRA explicitly forbid the USDA from applying the Roadless Rule to the Tongass. TTRA, for example, is "[s]ubject to appropriations, other applicable law, and the requirements of the National Forest Management Act . . . ."  16 U.S.C. § 539d(a).  The USDA therefore had discretion to adopt the Roadless Rule to protect wildlife, recreation, sustained use, and other values. *See Natural Res. Def. Council*, 421 F.3d at 801.  By the same token, nothing prevented the USDA from striking a different balance and choosing to exempt the Tongass.  Considering the purposes of ANILCA and TTRA, it is clear that Congress sought to promote a balance between environmental preservation, road access, and timber availability.  The USDA recognized this directive in promulgating the revised rule. The Supreme Court has "long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations. . . ."  *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).  We should abide by this principle, and defer to the actions of the USDA in promulgating an exemption to the Roadless Rule.

**B.  Timber Demand**

Likewise, the USDA's determination that applying the Roadless Rule to the Tongass would have led to a timber shortage was not arbitrary and capricious.  The majority fails to even acknowledge the agency's effort to promote timber production, a factor which, by itself, suffices to uphold the agency's 2003 rulemaking.

"A court generally must be 'at its most deferential' when reviewing scientific judgments and technical analyses within the agency's expertise." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011) (citation omitted). The USDA calculated that the average annual timber harvest in the Tongass between 1980 and 2002 was 269 million board feet (MMBF), which was higher than usual. The USDA estimated that in the years following the Roadless Rule, demand for timber would fall, but that demand would still be at least 124 MMBF. The USDA found that if the Roadless Rule were applied to the Tongass, the maximum timber harvest would be 50 MMBF, which would create a shortage of around 75 MMBF. The agency concluded that exempting the Tongass from the Roadless Rule would allow infrastructure to be built and boost timber production to meet national demand. 68 Fed. Reg. at 75,141–42.

## C. Socioeconomic Hardships

The USDA also revised the Roadless Rule because it reconsidered socioeconomic hardships caused by applying the rule to the Tongass. The majority fails to address this justification for the Tongass Exemption, which is yet another independent basis on which to uphold the agency's 2003 rulemaking.

The district court held that the Roadless Rule would not lead to job losses because reductions in timber demand had already occurred. It suggested that the fall in timber demand would have led to job losses, even without the Roadless Rule in place. However, the district court impermissibly substituted its factual determination for that of the agency. Although some jobs would have been lost with the fall in

demand, the USDA concluded that the application of the Roadless Rule to the Tongass would have exacerbated these losses. The USDA had clear reasons to revise the Roadless Rule to mitigate job losses caused by the fall in timber demand. This decision is adequately supported by material in the record.

## D.  Road and Utility Connections

Finally, the USDA promulgated the Tongass Exemption to encourage road and utility construction in the Tongass, another independent factor ignored by the majority that justifies the agency's action. Such infrastructure helps the timber industry and supports isolated communities in the national forest. The USDA found, for example, that "[t]he impacts of the roadless rule on local communities in the Tongass are particularly serious. Of the 32 communities in the region, 29 are unconnected to the nation's highway system. Most are surrounded by marine waters and undeveloped National Forest System land." 68 Fed. Reg. at 75,139.

## E.  Notice and Comment

Several of the arguments raised by Organized Village of Kake (the Village), and now affirmed by the majority, are policy-based. By overturning the Tongass Exemption, the majority conflates the process of judicial review with the agency's review of factual and policy questions. *See* 5 U.S.C. § 553(c) ("After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the

agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.").

The Village questions the merits of the USDA's decision to exempt the Tongass by raising what are primarily policy issues that were addressed by the notice and comment process. The USDA carefully considered comments it received before promulgating the 2003 exemption. *E.g.*, 68 Fed. Reg. at 75,138 ("The agency received comments regarding the effects the proposed exemption from the roadless rule would have on the natural resources of the Tongass. Some respondents expressed their view that 70 percent of the highest volume timber stands in Southeast Alaska have been harvested, and exempting the Tongass from the roadless rule would lead to the harvest of most or all of the remainder of such stands."); 68 Fed. Reg. 41,864, 41,865 (July 15, 2003) ("All interested parties are encouraged to express their views in response to this request for public comment on the following question: Should any exemption from the applicability of the roadless rule to the Tongass National Forest be made permanent and also apply to the Chugach National Forest?"). As long as the agency's decision has clear factual support in the record, as is the case here, it is not our place to substitute our policy preferences for those of the agency. *See Fox*, 556 U.S. at 513–14.

## III.    National Environmental Policy Act (NEPA) Claims

The Village claims that the USDA violated NEPA by neglecting to prepare a new environmental impact statement and by failing to consider alternatives to exempting the Tongass. The district court did not reach this issue because it reversed the agency on other grounds. Given my

disagreement with the majority, I would remand to the district court to consider the NEPA claims in the first instance.

I respectfully dissent.

KOZINSKI, Circuit Judge, dissenting:

I join Judge M. Smith's masterful dissent in full. I write only to note the absurdity that we are in the home stretch of the Obama administration and still litigating the validity of policy changes implemented at the start of the George W. Bush administration. How can a President with a mere four or eight years in office hope to accomplish any meaningful policy change—as the voters have a right to expect when they elect a new President—if he enters the White House tethered by thousands of Lilliputian ropes of administrative procedure? The glacial pace of administrative litigation shifts authority from the political branches to the judiciary and invites the type of judicial policymaking that Judge Smith points out. This is just one of the ways we as a nation have become less a democracy and more an oligarchy governed by a cadre of black-robed mandarins. I seriously doubt this is what the Founding Fathers had in mind and worry about the future of the Republic if the political branches fail to take back the power the Constitution properly assigns to them.